

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN THE MATTER OF THE
EXTRADITION OF FRANCIS CARR

CASE NUMBER:20CR370

**UNDER SEAL**

## COMPLAINT FOR PROVISIONAL ARREST IN FURTHERANCE OF EXTRADITION PURSUANT TO TITLE 18, UNITED STATES CODE, SECTION 3184

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter I represent the United States in fulfilling its treaty obligation to Ireland.

2. There is an extradition treaty in force between the United States and Ireland.[1]

3. Pursuant to the Treaty, the Government of Ireland has submitted a formal request through diplomatic channels for the arrest and extradition of Francis CARR.

4. According to information provided by the Government of Ireland, (*see* Exhibit A, Carr_Ext_0007-Carr_Ext_0023) Irish law enforcement authorities

---

[1] Treaty on Extradition Between the United States of America and Ireland, U.S.-Ir., July 13, 1983, T.I.A.S. No. 10813, and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Ireland, U.S.-Ir., July 14, 2005, S. TREATY DOC. No. 109-14 (2006) ("Instrument"). The Instrument (with Annex) reflects the integrated text of the provisions of the Treaty and the U.S.-EU Extradition Agreement (hereinafter collectively referred to as the "Treaty"). Exhibit A includes a copy of the Instrument and the Annex.

charged CARR on February 14, 2018, with dangerous driving causing the deaths of two victims, Sean Thomas Halloran and Orla O'Malley, in violation of section 53(1) of the Road Traffic Act 1961, as amended, of the Irish Statute Book.

5.      This offense was committed within the jurisdiction of Ireland. Judge Fiona Lydon of the District Court Area of Castlebar, Ireland, issued a warrant for CARR's arrest on February 14, 2018.

6.      The Government of Ireland is seeking CARR's extradition for the purpose of prosecution based on the following facts:

> On or about June 4, 2017 at approximately 4:06 a.m., Irish police received a report of a serious car crash involving a black Lexus on the R300, a public road, at Churchfield, Tourmakeady, County Mayo, Ireland.
>
> Upon arrival at the scene, a responding police officer observed that a black Lexus (registration number 00 C 10565) was located at a right angle to the road and the passenger side of the vehicle was crushed against a farmyard block wall. Two passengers were in the vehicle. Sean Thomas Halloran was in the front passenger seat slumped over and not breathing. Medical authorities determined he died immediately from injuries suffered upon impact. Orla O'Malley was in the back seat seriously injured and unconscious. She was transported by ambulance to a hospital, where hours later medical authorities pronounced her dead as a result of injuries suffered in the crash.
>
> The officer asked witnesses at the scene who else had been in the car, and they pointed to a man who was sitting on the steps of a house across the road. When the officer asked that man for his name, he said he was Francis CARR. Paramedics attended to CARR at the scene and then transported him by ambulance to a hospital, where he was treated for abdominal pain, a fracture to his finger, and bruising to his body.
>
> Further investigation revealed that on the evening of June 3, 2017, the Gaelic Athletic Association ("GAA") hosted an Irish Football Tournament at the GAA field in Tourmakeady. At approximately 11:00 p.m. that night, witnesses observed CARR join Sean Halloran, Orla O'Malley, and others at the GAA field.  Witnesses said they saw CARR

and others socializing and drinking alcohol at the field and the pub across the road, the Lough Mask Inn. CARR and the group remained in the area until approximately 3:15 a.m. to 3:30 a.m. on June 4, 2017. At that time, witnesses observed CARR get into a black Lexus in the pub's parking lot. Witnesses also saw Sean Halloran get into the front passenger seat and Orla O'Malley get into the back seat. Witnesses then observed CARR driving the vehicle from the parking lot at high speed. One witness described it as a "high speed . . . spin take off."

On or about June 4, 2017, at approximately 3:40 a.m., other witnesses heard the loud sounds of a car engine throttle revving up and down and tires screeching. One witness said he was awakened by a car traveling by his house. He said it sounded like the engine was being driven in low gear with high revs and then sudden breaking at the junction; it had a high exhaust note. When he opened the double doors of his bedroom to see what was happening, he saw a dark colored car rotating five times in the junction at Maire Luke's Bar and Restaurant. Another witness said he was at home at the time. He heard loud sounds as if a car was doing "donuts" at the crossroads for Maire Luke's. The loud donut sounds lasted for about five minutes, and then it sounded as if the car drove off, back towards Tourmakeady. As the car was driving away, this witness could hear something dragging from the car, and he expected the driver to stop but the driver did not. Another witness said he was standing with his girlfriend outside the patio door of her house, and he heard what sounded like a car "making donuts" in the crossroads of the R300/L5630 junction, which leads to Maire Luke's Bar and Restaurant. He then heard the throttle of a car engine going up and down, tires screeching, and a massive bang. Similarly, his friend said she heard a car engine revving and about a minute later, tires screeching and a loud thud, which sounded like a car crash. This couple immediately rushed to the scene of the crash.

Upon their arrival, the couple saw that it was a serious car crash. The woman ran back to her house to call an ambulance. Her boyfriend stayed at the scene. He saw CARR groaning in the driver's seat and two non-responsive passengers. He unbuckled CARR's seat belt, helped CARR from the driver's seat, and guided him across the street away from the smashed vehicle.

The first paramedic on the scene told officers that CARR admitted that he was driving and said he killed his friends. The paramedic also reported that CARR said he did not have automobile insurance. In a statement to investigators, CARR's father confirmed that CARR owned the black Lexus and did not have automobile insurance.

3

Forensic tests of CARR's black Lexus and marks at the crash site showed that the car was on the public road, when it skidded out of control into a pillar near a parking area outside a house. In addition, the passenger's side rear tire had cord exposed in two sections on the inner shoulder, which is an offense under Article 55(e) of the Road Traffic Regulations 2003. The underskirt of the front bumper of the car was found approximately 200 meters from the scene of the collision. Authorities were unable to obtain a blood or urine sample from CARR within the required period of time to test for the level of alcohol in his system.

On or about June 14, 2017, investigators interviewed CARR in the presence of his attorney at the Castlebar police station. CARR admitted that he owned the black Lexus and did not have automobile insurance required by law. CARR maintained that he could not remember what happened on the night of the crash and "guess[ed]" that he drove his own car that night.

On or about June 20, 2017, police officers arrested CARR at his home in Cappaduff, Tourmakeady and transported him to the Castlebar police station. CARR was photographed and fingerprinted, and interviewed by investigators in the presence of his attorney. Investigators played a surveillance video for CARR. The video shows CARR on June 3, 2017 at approximately 8:00 p.m. driving his black Lexus into Maire Luke's Bar and Restaurant parking lot and getting out of the driver's seat of the car. Investigators also read witness statements to him. CARR maintained that he has no clear memory of much of the night of the crash and accepted that he was the driver of his own car.

The Office of the Director of Public Prosecutions reviewed the matter and on or about November 23, 2017, issued a directive to charge CARR with dangerous driving causing the deaths of two victims, Sean Thomas Halloran and Orla O'Malley, contrary to section 53(1) of the Road Traffic Act 1961, as amended. On or about February 14, 2018, CARR was charged with the crime, and the District Court issued the arrest warrant that same day.

7.      Carr may be found within the jurisdiction of this Court at 1632 S. Ashland Ave., Park Ridge, IL 60068.

8. Tom Heinemann, an attorney in the Office of the Legal Adviser of the United States Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the Government of Ireland requested extradition and a copy of the Instrument, with Annex, amending the 1983 Treaty, stating that the Annex covers the offense for which Ireland requests extradition and confirming that the documents supporting the extradition request bear the certificate or seal of the Ireland Department of Foreign Affairs and Trade so as to enable them to be received in evidence in accordance with Article VIII of the Annex.

9. The declaration from the Department of State with its attachments, including a copy of the diplomatic note from Ireland, a copy of the Instrument with Annex, and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit A) are filed with this complaint and incorporated by reference herein.

10. CARR likely would flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the arrest of Francis Carr be issued in accordance with the Treaty and 18 U.S.C. § 3184 so that Carr may be arrested and brought before this Court, "to the end that the evidence of criminality may be heard and considered," 18 U.S.C. § 3184, and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

JASMINA VAJZOVIC
Assistant United States Attorney

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named individual provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: July 20, 2020

_Judge's signature_

City and State: Chicago, Illinois

SHEILA M. FINNEGAN, U.S. Magistrate Judge
_Printed name and title_

6



DISTRICT OF COLUMBIA, ss:

## DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, declare and say as follows:

1. I am an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Francis Carr. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Ireland are found in the Treaty on Extradition between the United States of America and Ireland signed 13 July 1983 (the "1983 Treaty") and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Ireland signed 13 July 1983 (the "Instrument"). The Annex to the Instrument (the "Annex") contains all relevant treaty provisions governing extradition that apply between the United States and Ireland. A copy of the Instrument with Annex is attached to this declaration.

3. In accordance with the provisions of the Annex, the Embassy of Ireland has submitted Diplomatic Note 534/603, dated 30 January 2019, formally requesting the extradition of Francis Carr. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article XVI of the Annex, the Government of the United States of America represents the interests of the Government of Ireland in proceedings in U.S. courts arising out of Ireland's extradition requests, and the Government of Ireland provides similar representation in its courts with respect to extradition requests made by the United States.

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

...tify That Tom Heinemann, whose name is subscribed to the document hereunto annexed, was
t... ...e of subscribing the same Assistant Legal Adviser , Office of the Legal Adviser, Department
S... ...United States of America, and that full faith and credit are due to his acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*



In testimony whereof, I, Michael R. Pompeo, Secretary of State ,
have hereunto caused the seal of the Department of State to be
affixed and my name subscribed by the Assistant Authentication
Officer, of the said Department, at the city of Washington, in the
District of Columbia, this seventeenth day of May, 2019.

*Issu... ...uant to CHXIV, ...of*
*Sept... ...789, 1 Stat. 68-*
*USC... ...22USC 2651a;*
*301;... ...C 1733 et. seq.; ...*
*1443... ...LE 44 Federal Ru...*
*Civil... ...ture.*

_____
Secretary of State

By _____

Assistant Authentication Officer,
Department of State

-2-

5. The offense for which the fugitive's extradition is sought is extraditable under Article II of the Annex.

6. Under Article VIII of the Annex, documents that bear the certificate or seal of the Department of Justice, or Department responsible for foreign affairs, of the requesting state are admissible in extradition proceedings without further certification, authentication, or other legalization. Therefore, such documents satisfy authentication requirements without the need for certification by the U.S. Embassy in Dublin. Ireland, in submitting documents in the instant case that bear the certificate or seal of the Department of Foreign Affairs and Trade, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 16th, 2019.

TOM HEINEMANN

Attachments:
1.    Copy of Note
2.    Copy of Instrument with Annex

AMBASÁID NA HÉIREANN **L/LEI**

TELEPHONE: (202) 462-3939 2019 JAN 30 P 2:40

FAX: (202) 232-5993 **DEPARTMENT OF STATE**



EMBASSY OF IRELAND
2234 MASSACHUSETTS AVE., N.W.
WASHINGTON, D.C. 20008

Ref: 534/603

The Embassy of Ireland presents its compliments to the Department of State and has the honour to refer to the Treaty on Extradition between Ireland and the United States of America, done at Washington on 13 July 1983, as amended by the Instrument contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America signed on 25 June 2003, done at Dublin on 14 July 2005 and, on behalf of Ireland, requests the extradition from the United States of America of Francis Carr, a citizen of Ireland and of the United States of America.

The said Francis Carr is sought by the Irish authorities to be prosecuted in relation to the offence of dangerous driving causing death or serious bodily harm, contrary to section 53(1) of the Road Traffic Act 1961, as amended.

The Embassy has the further honour to indicate that, in accordance with Article VIII of the aforesaid Treaty the following documents, in support of the request for extradition, are submitted herewith, under the seal of the Minster for Foreign Affairs and Trade of Ireland:

PART I
Pursuant to paragraph 2(a), 2(b) and 2(c) of Article VIII of the Treaty, information which will help to establish the identity and location of Francis Carr and a brief statement of the facts of the case.

PART II
Pursuant to paragraph 3(a), 3(b) and 3(c) of Article VIII of the Treaty, documents with a description of Francis Carr, a statement of the pertinent facts of the case and a legal description of the offence, a statement of the maximum penalty for the offence and a statement of the relevant law.

PART III
Pursuant to paragraph 4(a), 4(b) and 4(c) of Article VIII of the Treaty, authenticated copies of the arrest warrants, authenticated copies of the complaint, information or indictment and a statement of facts by way of affidavit setting forth reasonable grounds for believing that the offence has been committed and that Francis Carr committed it.

The Embassy wishes to advise the Department of State that the Irish authorities are willing to provide additional material and information in accordance with Article IX of the Treaty should this be requested, including material and information relating to the documents contained in the request. In addition the Irish authorities are prepared to make available police officers for the purpose of giving Court evidence in the United States of America in relation to any matter arising by virtue of this request.

The Embassy attaches hereto the authenticated original documents under the seal of the Minister for Foreign Affairs and Trade of Ireland and three (3) copies of this folder.

The Embassy requests the State Department to keep it informed of developments in relation to this request.

The Embassy of Ireland avails itself of this opportunity to renew to the Department of State the assurance of its highest consideration.

30 January 2019



TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.12

# EXTRADITION

**Instrument Amending the**

**Treaty of July 13, 1983**

**Between the**

**UNITED STATES OF AMERICA**

**and IRELAND**

Signed at Dublin July 14, 2005

*with*

Annex



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# IRELAND

## Extradition

*Instrument amending the treaty of July 13, 1983.*
*Signed at Dublin July 14, 2005;*
*Transmitted by the President of the United States of America*
*    to the Senate September 28, 2006 (Treaty Doc. 109-14,*
*    109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
*    July 29, 2008 (Senate Executive Report No. 110-12,*
*    110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
*    September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Diplomatic Notes at Washington*
*    August 11 and 12, 2009;*
*Entered into force February 1, 2010.*
*With annex.*

**Instrument as contemplated by Article 3(2) of the
Agreement on Extradition between the United States of America
and the European Union signed 25 June 2003,
as to the application of the Treaty on Extradition between
the United States of America and Ireland signed 13 July 1983**

1.     As contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Extradition Agreement"), the Governments of the United States of America and Ireland acknowledge that, in accordance with the provisions of this Instrument, the U.S.-EU Extradition Agreement is applied in relation to the bilateral Treaty on Extradition between the United States of America and Ireland signed 13 July 1983 (hereafter "the 1983 Treaty on Extradition") under the following terms:

(a)    Article 5 of the U.S.-EU Extradition Agreement as set forth in Article VIII(1) and (7) of the Annex to this Instrument shall govern the mode of transmission, and requirements concerning certification, authentication or legalisation of the extradition request and supporting documents;

(b)    Article 7(1) of the U.S.-EU Extradition Agreement as set forth in Article VIII(8) of the Annex to this Instrument shall provide an alternative method for transmission of the request for extradition and supporting documents following provisional arrest;

(c)    Article 8(2) of the U.S.-EU Extradition Agreement as set forth in Article IX(3) of the Annex to this Instrument shall govern the channel to be used for submitting supplementary information;

(d)    Article 9 of the U.S.-EU Extradition Agreement as set forth in Article VII *bis* of the Annex to this Instrument shall govern the temporary surrender of a person being proceeded against or serving a sentence in the Requested State;

(e)    Article 10 of the U.S.-EU Extradition Agreement as set forth in Article XII of the Annex to this Instrument shall govern the decision on requests made by several States for the extradition or surrender of the same person;

(f)    Article 11 of the U.S.-EU Extradition Agreement as set forth in Article XII *bis* of the Annex to this Instrument shall govern the use of simplified extradition procedures;

(g)    Article 12(3) of the U.S.-EU Extradition Agreement as set forth in Article XV(2) of the Annex to this Instrument shall govern the procedures governing transit in the event of unscheduled landing of aircraft;

(h)    Article 13 of the U.S.-EU Extradition Agreement as set forth in Article VI of the Annex to this Instrument shall govern extradition with respect to conduct punishable by death in the Requesting State;

(i)    Article 14 of the U.S.-EU Extradition Agreement as set forth in Article VIII *bis* of the Annex to this Instrument shall govern consultations where the Requesting

1

State contemplates the submission of particularly sensitive information in support of a request for extradition.

2.    The Annex reflects the integrated text of the provisions of the 1983 Treaty on Extradition and the U.S.-EU Extradition Agreement that shall apply upon entry into force of this Instrument.

3.    In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Instrument shall apply to offences committed before as well as after it enters into force.

4.    This Instrument shall not apply to requests for extradition made prior to its entry into force; except that, in accordance with Article 16 of the U.S.-EU Extradition Agreement, Article VII *bis* of the Annex shall be applicable to requests made prior to such entry into force.

5.    (a)    This Instrument shall be subject to the completion by the United States of America and Ireland of their respective applicable internal procedures for entry into force. The Governments of the United States of America and Ireland shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

    (b)    In the event of termination of the U.S.-EU Extradition Agreement, this Instrument shall be terminated and the 1983 Treaty on Extradition shall be applied. The Governments of the United States of America and Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorised by their respective Governments, have signed this Instrument.

DONE at Dublin, in duplicate, this 14 day of July 2005.


FOR THE GOVERNMENT OF THE    FOR THE GOVERNMENT OF

UNITED STATES OF AMERICA:    IRELAND:

2

ANNEX

## TREATY ON EXTRADITION BETWEEN

## THE UNITED STATES OF AMERICA AND IRELAND

### ARTICLE I: Obligation to Extradite

Each Contracting Party agrees to extradite to the other, in accordance with the provisions of this Treaty, but subject to the law of the Requested State and to such exceptions as are therein provided, any persons, including its citizens or nationals, who are wanted for prosecution or the imposition or enforcement of a sentence in the Requesting State for an extraditable offence.

### ARTICLE II: Extraditable Offences

1. An offence shall be an extraditable offence only if it is punishable under the law of both Contracting Parties by imprisonment for a period of more than one year, or by a more severe penalty. When the request for extradition relates to a person who is wanted for the enforcement of a sentence of imprisonment, extradition shall be granted only if the duration of the sentence still to be served amounts to at least four months.

2. For the purpose of this Article, it shall not matter:

> (a) whether the laws of the Contracting Parties place the offence within the same category of offence or denominate the offence by the same terminology; or

> (b) whether the offence is one for which United States federal law requires proof of interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

3. Subject to the conditions set forth in paragraph 1 of this Article, extradition shall also be granted for attempt and conspiracy to commit, aiding, abetting, counselling, procuring, inciting, or otherwise being an accessory to the commission of, an offence referred to in paragraph 1.

4. If extradition is granted for an extraditable offence, it may also be granted for any other offence for which extradition is requested that meets all the requirements for extradition other than the periods of imprisonment specified in paragraph 1 of this Article.

3

**ARTICLE III: Place of Commission of Offence**

1. Extradition shall not be refused on the ground that the offence for which extradition is requested was committed outside the Requesting State.

2. Extradition may be refused when the offence for which extradition is requested is regarded under the law of the Requested State as having been committed in its territory. If extradition is refused pursuant to this paragraph, the Requested State shall submit the case to its competent authorities for the purpose of prosecution.

**ARTICLE IV: Exceptions to Extradition**

Extradition shall not be granted in any of the following circumstances:

> (a) when the person whose surrender is sought has been convicted or acquitted, or a prosecution is pending against that person, in the Requested State, for the offence for which extradition is requested;

> (b) when the offence for which extradition is requested is a political offence. Reference to a political offence shall not include the taking or attempted taking of the life of a Head of State or a member of his or her family;

> (c) when there are substantial grounds for believing that a request for extradition for an ordinary criminal offence has been made for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality or political opinion. Unless the law of the Requested State otherwise provides, decisions under this paragraph shall be made by the executive authority; or

> (d) when the offence for which extradition is requested is a military offence which is not an offence under the ordinary criminal law of the Contracting Parties.

**ARTICLE V: Discretionary Grounds for Refusal of Extradition**

Extradition may be refused in any of the following circumstances:

> (a) when the person whose surrender is sought has been convicted or acquitted in a third State of the offence for which extradition is requested; or

> (b) when the competent authorities of the Requested State have decided to refrain from prosecuting the person whose surrender is sought for the offence for which extradition is requested, or to discontinue any criminal proceedings which have been initiated against that person for that offence.

4

## ARTICLE VI: Capital Punishment

Where the offence for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed shall not be carried out. If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions. If the Requesting State does not accept the conditions, the request for extradition may be denied.

## ARTICLE VII: Postponement of Surrender

When the person whose extradition is requested is being, or is about to be, proceeded against, or has been convicted, in the Requested State in respect of an offence other than that for which extradition has been requested, surrender may be postponed until the conclusion of the proceedings and the full execution of any punishment the person may be or may have been awarded.

## ARTICLE VII *bis*: Temporary surrender

1. If a request for extradition is granted in the case of a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution.

2. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State at the conclusion of the proceedings against that person, in accordance with the conditions to be determined by mutual agreement of the Requesting and Requested States. The time spent in custody in the territory of the Requesting State pending prosecution in that State may be deducted from the time remaining to be served in the Requested State.

## ARTICLE VIII: Extradition Procedure and Required Documents

1. The request for extradition shall be made in writing and shall be transmitted, with supporting documents, through the diplomatic channel, which shall include transmission as provided for in paragraph 8 of this Article.

2. The request for extradition shall contain:

    (a) information which will help to establish the identity of the person sought;

5

(b) the location of the person if known or, if it is not known, a statement to that effect; and

(c) a brief statement of the facts of the case.

3. Every request for extradition shall be supported by documents which contain:

(a) as accurate a description as possible of the person sought, together with any other information which will assist in establishing the person's identity and nationality;

(b) a statement of the pertinent facts of the case, indicating as accurately as possible the time and place of commission of the offence; and

(c) the legal description of the offence and a statement of the maximum penalties therefor and the text of the law setting forth the offence or, where this is not possible, a statement of the relevant law.

4. When the request for extradition relates to a person who has not been convicted, it shall also be supported:

(a) by the original or an authenticated copy of the warrant of arrest, or equivalent order, issued by a competent authority of the Requesting State;

(b) by the original or an authenticated copy of the complaint, information or indictment; and

(c) in the case of a request emanating from Ireland, by a statement of facts, by way of affidavit or statutory declaration, setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it.

5. When the request for extradition relates to a convicted person, it shall also be supported:

(a) by the original or an authenticated copy of the judgment of conviction; and

(b) if a sentence has been imposed, by the original or an authenticated copy of the sentence and a statement of the extent to which it has been carried out and that it is immediately enforceable.

6. All documents transmitted by the Requesting State shall be in English or shall be translated into English by that State.

7. Documents that bear the certificate or seal of the Department of Justice, or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalisation. "Department of Justice" shall, for the United States of America, mean the United States Department of Justice, and, for Ireland, the Department of Justice, Equality and Law Reform.

6

8. If the person whose extradition is sought is held under provisional arrest by the Requested State, the Requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to paragraph 1 of this Article, by submitting the request and documents to the Embassy of the Requested State located in the Requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the Requested State for purposes of applying the time limit that must be met under Article X of this Treaty to enable the person's continued detention.

### ARTICLE VIII *bis*: Sensitive information in a request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

### ARTICLE IX: Additional Evidence or Information

1. If the Requested State requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information shall be submitted to it within such time as that State shall specify.

2. If the person sought is in custody and the additional evidence or information submitted as aforesaid is found insufficient or if such evidence or information is not received within the period specified by the Requested State, the person shall be discharged from custody. Such discharge shall not preclude the Requesting State from submitting another request in respect of the same offence.

3. Such additional evidence or information may be requested and furnished directly between the United States Department of Justice and the Department of Justice, Equality and Law Reform in Ireland.

### ARTICLE X: Provisional Arrest

1. In case of urgency, a Contracting Party may request the provisional arrest of a person sought. The request for provisional arrest shall be made through the diplomatic channel or directly between the United States Department of Justice and the Department of Justice, Equality and Law Reform in Ireland, in which case the facilities of INTERPOL may be used. The request may be transmitted by post or telegraph or by any other means affording evidence in writing.

7

2. The request shall contain:

    (a) a description of the person sought;

    (b) a statement of the nature of the offence and of the time at which and the place where it is alleged to have been committed;

    (c) a statement of the existence of one of the documents referred to in paragraph 4(a) or 5 of Article VIII; and

    (d) a statement that it is intended to send a request for extradition.

3. On receipt of such a request, the Requested State shall take the appropriate steps to secure the arrest of the person sought. The Requesting State shall be promptly notified of the result of its request.

4. Unless the law of the Requested State otherwise provides, a person arrested upon such a request shall be released upon the expiration of forty-five days from the date of that person's arrest if the request for extradition has not been duly received by the Requested State. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if a request for extradition is subsequently received.

## ARTICLE XI: Rule of Speciality

1. A person extradited under this Treaty shall not be proceeded against, sentenced, punished, detained or otherwise restricted in his or her personal freedom in the Requesting State for an offence other than that for which extradition has been granted, or be extradited by that State to a third State, unless:

    (a) the person has left the Requesting State after extradition and has voluntarily returned to it;

    (b) the person, having had an opportunity to leave the Requesting State, has not done so within forty-five days of final discharge in respect of the offence for which that person was extradited; or

    (c) the Requested State has consented.

2. Where the description of the offence charged in the Requesting State is altered in the course of proceedings, the person extradited shall not be proceeded against, sentenced, punished, detained or otherwise restricted in his or her personal freedom except insofar as the offence under its new description is composed of the same constituent elements as the offence for which extradition was granted.

3. Unless the law of the Requesting State otherwise provides, the person extradited may be proceeded against, sentenced, punished, detained or otherwise restricted in his or her

8

personal freedom for an offence for which that person could be convicted, under the law of that State, upon trial for the offence for which extradition was granted.

4. These stipulations shall not apply to offences committed after the extradition.

## ARTICLE XII: Multiple Requests

1. If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offence or for different offences, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2. If Ireland receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offence or for different offences, its High Court, or such other authority as it may subsequently designate, shall determine to which State, if any, the person is to be surrendered.

3. In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

(a)     whether the requests were made pursuant to a treaty;
(b)     the places where each of the offences was committed;
(c)     the respective interests of the requesting States;
(d)     the seriousness of the offences;
(e)     the nationality of the victim;
(f)     the citizenship or nationality of the person sought;
(g)     the possibility of any subsequent extradition between the requesting States; and
(h)     the chronological order in which the requests were received from the requesting States.

## ARTICLE XII *bis*: Simplified extradition procedures

If the person sought consents to be surrendered to the Requesting State, the Requested State may, in accordance with the principles and procedures provided for under its legal system, surrender the person as expeditiously as possible without further proceedings. The consent of the person sought may include agreement to waiver of protection of the rule of specialty.

## ARTICLE XIII: Notification of Decision

1. The Requested State shall promptly communicate to the Requesting State through the diplomatic channel the decision on the request for extradition.

9

2. The Requested State shall provide reasons for any partial or complete rejection of the request for extradition. It shall also provide the Requesting State with a copy of each opinion issued by its courts in connection with a request for extradition under this Treaty.

3. If a warrant or order for the extradition of a person sought has been issued by the competent authority and the person is not removed from the territory of the Requested State within such time as may be prescribed by the law of that State, that person may be set at liberty and the Requested State may subsequently refuse to extradite that person for that offence.

## ARTICLE XIV: Surrender of Property

1. To the extent permitted under the law of the Requested State and subject to the rights of third parties, which shall be duly respected, all property which appears to have been acquired as a result of the offence in question or which may be required as evidence shall, if found, be seized and surrendered to the Requesting State if the person sought is extradited or if extradition, having been granted, cannot be carried out by reason of the death or escape of that person.

2. The Requested State may make the surrender of the property conditional upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable, and may defer its surrender if it is needed as evidence in the Requested State.

## ARTICLE XV: Transit

1. Transit through the territory of one of the Contracting Parties of a person surrendered to the other Contracting Party by a third State may be granted on request subject to the law of the State of transit and to such conditions as that State may impose. For the purpose of considering the request, the State of transit may require the submission of such information as it considers necessary.

2. Authorisation is not required when air transportation is used and no landing is scheduled on the territory of the transit State. If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit that contains a description of the person being transported and a brief statement of the facts of the case. A request for transit shall be made through the diplomatic channel or directly between the United States Department of Justice and the Irish Department of Justice, Equality and Law Reform. The facilities of the International Criminal Police Organisation (INTERPOL) may be used to transmit such a request. All measures necessary to prevent the person from absconding shall be taken until transit is effected, as long as the request for transit is received within 96 hours of the unscheduled landing.

10

**ARTICLE XVI: Representation**

1. The Department of Justice of the United States shall advise, assist and represent, or provide for the representation of, Ireland in any proceedings in the United States arising out of a request for extradition made by Ireland.

2. The Attorney General of Ireland shall advise and assist, and represent, or provide for the representation of, the interests of the United States in any proceedings in Ireland arising out of a request for extradition made by the United States.

3. The functions referred to in this Article may be assumed by any successor agency designated by the State concerned.


**ARTICLE XVII: Expenses**

1. The Requesting State shall bear all expenses arising out of the translation of documents and the transportation of the person sought from the place of the extradition proceedings to the Requesting State. Notwithstanding any law to the contrary, the Requested State shall bear all other expenses arising out of the request for extradition and the proceedings.

2. The Requested State shall make no pecuniary claim against the Requesting State arising out of the arrest, detention, extradition proceedings and surrender of a person sought under this Treaty.


**ARTICLE XVIII: Termination**

Either Contracting Party may terminate this Treaty by giving written notice to the other Contracting Party at any time, and the termination shall become effective six months after the date of receipt of such notice.

11

AMBASÁID NA HÉIREANN 

TELEPHONE: (202) 462-3939

FAX: (202) 232-5993



EMBASSY OF IRELAND
2234 MASSACHUSETTS AVE., N.W.
WASHINGTON, D.C. 20008

Ref:    534/603

The Embassy of Ireland presents its compliments to the Department of State and has the honour to refer to the Treaty on Extradition between Ireland and the United States of America, done at Washington on 13 July 1983, as amended by the Instrument contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America signed on 25 June 2003, done at Dublin on 14 July 2005 and, on behalf of Ireland, requests the extradition from the United States of America of Francis Carr, a citizen of Ireland and of the United States of America.

The said Francis Carr is sought by the Irish authorities to be prosecuted in relation to the offence of dangerous driving causing death or serious bodily harm, contrary to section 53(1) of the Road Traffic Act 1961, as amended.

The Embassy has the further honour to indicate that, in accordance with Article VIII of the aforesaid Treaty the following documents, in support of the request for extradition, are submitted herewith, under the seal of the Minster for Foreign Affairs and Trade of Ireland:

PART I
Pursuant to paragraph 2(a), 2(b) and 2(c) of Article VIII of the Treaty, information which will help to establish the identity and location of Francis Carr and a brief statement of the facts of the case.

PART II
Pursuant to paragraph 3(a), 3(b) and 3(c) of Article VIII of the Treaty, documents with a description of Francis Carr, a statement of the pertinent facts of the case and a legal description of the offence, a statement of the maximum penalty for the offence and a statement of the relevant law.

PART III
Pursuant to paragraph 4(a), 4(b) and 4(c) of Article VIII of the Treaty, authenticated copies of the arrest warrants, authenticated copies of the complaint, information or indictment and a statement of facts by way of affidavit setting forth reasonable grounds for believing that the offence has been committed and that Francis Carr committed it.

The Embassy wishes to advise the Department of State that the Irish authorities are willing to provide additional material and information in accordance with Article IX of the Treaty should this be requested, including material and information relating to the documents contained in the request. In addition the Irish authorities are prepared to make available police officers for the purpose of giving Court evidence in the United States of America in relation to any matter arising by virtue of this request.

The Embassy attaches hereto the authenticated original documents under the seal of the Minister for Foreign Affairs and Trade of Ireland and three (3) copies of this folder.

The Embassy requests the State Department to keep it informed of developments in relation to this request.

The Embassy of Ireland avails itself of this opportunity to renew to the Department of State the assurance of its highest consideration.

30th January 2019



# IRELAND

**Treaty on Extradition between Ireland and the United States of America, done at Washington on 13 July 1983, as amended by the Instrument contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America signed on 25 June 2003, done at Dublin on 14 July 2005**

I, Anne-Marie O'Sullivan, Assistant Legal Adviser in the Department of Foreign Affairs and Trade, an officer of Ireland, hereby certify that the documents attached hereto have been prepared in support of the request for the extradition from the United States of America to Ireland of Francis Carr, a Citizen of Ireland and the United States.

I further certify that the seal affixed to this certificate is the seal of the Minister for Foreign Affairs and Trade of Ireland, a Minister of the Government of Ireland.

I further certify that the said seal duly authenticates all documents attached to this certificate, submitted in support of this request.

Signed and sealed at Dublin, this 24th day of January 2019

A person authorised by law to
authenticate the Seal of the Minister
for Foreign Affairs and Trade of Ireland
pursuant to the Ministers and
Secretaries Act, 1924

Treaty on Extradition between the Ireland and the United States of America
done at Washington on the 13th of July 1983.


Request by the Irish Authorities for the Extradition from the United States of
America of Francis Carr, Date of Birth, 2nd of July, 1998, a Citizen of the
United States of America and Irish Citizen

<u>INDEX</u>

Part 1: Information required pursuant to Article VIII Paragraph 2 of the Treaty on Extradition between Ireland and the United States of America.

Part 2: Documents containing information required pursuant to Article VIII paragraph 3 of the Treaty on Extradition between Ireland and the United States of America.

Part 3: Material required pursuant to Article VIII Paragraph 4 of the Treaty on Extradition between Ireland and the United States of America.

## Part 1: Information required pursuant to Article VIII Paragraph 2 of the Treaty on Extradition between Ireland and the United States of America.

(a) Information which will help to establish the identity of the person sought.

(b) The location of the person sought.

(c) A brief statement of the facts of the case.

CARR_EXT_0006

**(a) Information which will help to establish the identity of the person sought.**

Name :  **Francis Carr**

Born :  **Chicago Illinois, United States of America.**

Address :  **Currently believed to be residing in Boston, Massachusetts, United States of America.**

Date of Birth: **2nd of July, 1998,**

Sex: **Male**

Nationality: **United States Citizen and Irish Citizen**

Characteristics:

Photograph and Fingerprints attached:

Passport number:

Background details which my further assist: **The requested person has an active presence on Facebook social media and is believed to be in Boston, Massachusetts, United States of America. He has dual Irish and United States of America citizenship. He has previously lived in London, United Kingdom and Ireland.**



This is a photograph of FRANCIS CARR, DOB: 2nd July 1998, taken whilst in Police Custody.

I certify that this is a true copy
of the original
Signed: _____
Date: 10 12 2016
Garda Extradition Section

, Sgt

July 199

This is a copy taken := Police Custody.



**(b) The location of the person sought.**

**Boston, Massachusetts, United States of America.**

## (c) A brief statement of the facts of the case.

**It is alleged:**

At approximately 3:40 a.m. on the 4th June 2017, a single vehicle road traffic accident occurred at Churchfield, Tourmakeady County Mayo, Ireland. A black Lexus Altezza, IS200 registration number 00C10565, was located crashed at a right angle to the road, with the passenger side of the vehicle, crushed against a farmyard block wall. The vehicle had entered the parking area outside a private residence on its side of the road and then crashed into a pillar on the opposite side of the road. The driver of this vehicle, was a male Francis Carr (the requested person). On Forensic examination, speed marks showed the car was out of control. A male passenger died instantly as a result of the impact, and a female passenger died later on the 5th of June, 2017 as a result of the collision. The male deceased was Sean Thomas Halloran, d.o.b. (02/08/1996) and the female deceased was Orla O'Malley (15/08/1998). It is alleged the dangerous driving of Francis Carr at Churchfield, Tourmakeady County Mayo, Ireland on the 4th of June, 2017, caused the death of the two deceased.

A person convicted of Dangerous Driving causing death is liable to a maximun sentence not exceeding 10 years.

CARR_EXT_0011

**Part 2: Documents containing information required pursuant to Article VIII Paragraph 3 of the Treaty on Extradition between Ireland and the United States of America.**

(a) As accurate a description as possible of the person sought together with information, which will assist in establishing the person's identity and nationality.

(b) A statement of the pertinent facts of the case indicating the time and place of commission of the offences.

(c) The legal description of the offences and statements of the relevant laws and maximum penalties therefor, texts of the law and a statement of the relevant Law.

CARR_EXT_0012

**(a) As accurate, a description as possible of the person sought together with information, which will assist in establishing the person's identity and nationality.**

**Please see the details as set out in Part 1 (a) of the Extradition Request.**

## (b) A statement of the pertinent facts of the case indicating the time and place of commission of the offences.

**It is alleged as follows:**

At 04.06 a.m. on the 4th June 2017, the communications room in Castlebar Garda Station, County Mayo, received a telephone call from an ambulance control stating that they were on the way to a road traffic accident in Churchfield, Tourmakeady County Mayo, Ireland. An Garda Síochána are the Police Service in Ireland, Garda Patrick Egan, who was detailed for duty in the communications room, was immediately sent to the scene. Garda Patrick Egan arrived at the location of the incident at Churchfield, Tourmakeady, County Mayo, (on a section of the R300 approximately 3.8 kilometres south of Tourmakeady) a public place, at 04.22 a.m. approximately on the 4th of June, 2017.

Previously, on the 3rd of June 2017, Sean Halloran had travelled to Tourmakeady with his friends, Daniel Gibbons, Ross McGrath, Gary Hopkins, and Justin Morrin. They arrived at the Comortas Peile Na Gaeltachta (Irish Football Tournament) at 9.20 p.m. approximately, and parked in the field across from the Lough Mask Inn, a public house in Tourmakeady, County Mayo. Sean Halloran had met Orla O'Malley and Chloe Gibbons and stayed with them socialising and drinking with them. At approximately 11 p.m. the Requested Person Francis Carr joined the group, and Patrick Hession did so later.

After 12 a.m. on the 4th of June, 2017, Sean Halloran, Orla O'Malley, Francis Carr, Gary Hopkins, Chloe Gibbons and Ross McGrath made their way to the Lough Mask Inn Tourmakeady, County Mayo, and stayed there for approximately thirty minutes or so before returning to the marquee at the Gaelic Athletic Association pitch/field.

After several more drinks Sean Halloran, Orla O'Malley, Francis Carr, Chloe Gibbons and Ross McGrath made their way back down to the Lough Mask Inn again. The pub was now closed, but a large crowd had gathered outside it.

Francis Carr, was observed getting into a car, a black Lexus Alteeza IS200, registration number, 00 C10565 between 3.15 a.m. and 3.30 a.m. on the 4th of June, 2017, in the car park of The Lough Inn, Treenlaur, Tourmakeady, County Mayo, Sean Halloran (deceased) was observed getting into the passenger seat of the Lexus Alteeza IS200, registration number, 00 C10565, between 3.15 a.m. and 3.30 a.m. in the car park of The Lough Inn, Treenlaur, Tourmakeady, County Mayo. Orla O'Malley (deceased) , got into the back seat of the Lexus Alteeza between 3.15 a.m. and 3.30.a.m. in the car park of The Lough Inn, Treenlaur, Tourmakeady, County Mayo. The Lexus Alteeza was observed pulling away at speed from the Lough Mask Inn on the 4th of June, 2017, between 3.15 a.m. and 3.30 a.m. in the car park of The Lough Inn, Treenlaur, Tourmakeady, County Mayo.

Francis Carr was the holder of a full Irish Driving Licence, which was obtained on the 8th of December, 2016.

Closed Circuit Television from Maire Luke's public house Gortmore Tourmakeady, County Mayo, on the 3rd of June, 2017, showed the Lexus Alteeza 00 C 10565 pulling up into the car park at 8.06 p.m. Francis Carr can be seen on the CCTV, getting out from the driver's side

of the car. The Closed Circuit Television also captured an unknown passenger getting out of the car.

According to eye witnesses, Francis Carr met with Sean Halloran and Orla O'Malley in the marquee at Tourmakeady GAA club at approximately 11: 00 p.m. on the 3rd of June, 2017. According to witnesses, Francis Carr was drinking alcohol.

Elaine Maree was working in the Lough Mask Inn, Tourmakeady, Claremorris, County Mayo on the 3rd of June, 2017. In her cautioned witness statement made on the 8th of July, 2018, she told investigators that Francis Carr's vehicle was parked in the car park of the Lough Mask Inn at some time after 8 p.m. Elaine Maree stated in her witness statement that Francis Carr's vehicle wasn't there, when she commenced her shift, but as the night progressed, she noticed it parked outside as she was collecting glasses. According to Elaine Maree, she knew it was Francis Carr's vehicle, as she had seen him driving it on a few occasions before he left for London, United Kingdom. She stated:

*'Somewhere between 3:15 a.m. and 3:45 a.m. I heard a car leaving the car park in what I would describe as erratically. I heard the sound of chippings flying.'*

Elaine Maree finished work at 4 a.m. on the 4th of June, 2017. She observed that Francis Carr's vehicle was gone at about 4 a.m. or 4.05 a.m.

Ross McGrath was standing outside the Lough Mask Inn with Sean Halloran, Orla O'Malley, and Chloe Gibbons between 3.15 a.m. and 3.30 a.m. on the 4th June 2017. Ross McGrath made a cautioned witness statement on the 11th of June, 2017. He stated:

'*Frank kind of headed off on his own. He was heading for his car. It is a Lexus IS200, black. Sean Hopped in before Frank started the car. Then Orla hopped into the car as the car was running.*' Ross McGrath stated: '*He took off very fast and Frank was spinning the tyres as he took off.*'

Chloe Gibbons in her cautioned witness statement of the 19th June 2017, stated that Frank Carr came to be in their company at approximately 11 p.m. on the 3rd of June, 2017,

She stated: '*Frank Carr was drunk.*'

Chloe Gibbons further stated in relation to the 4th of June, 2017:

'*I seen Sean and Orla getting into Frank's car. Sean got in directly behind Sean. They hadn't the door closed when Frank took off at high speed, it was like a spin take off.*'

Patrick Hession provided a cautioned witness statement to An Garda Síochána on the 30th of September, 2017. He stated that he went to Tourmakeady at approximately 11.00 p.m. on the night of the 3rd of June, 2017, and he met with his friends. He further stated they were having a great night in Tourmakeady and that:

'*Orla Frankie and myself did two rounds of shots, maybe jager bombs*' (Jagermeister and Redbull).

Patrick Hession stayed in the marquee all night, and was on the way home to Ballinrobe on the bus when Francis Carr rang him to come back. Patrick Hession got off the bus at the Village Inn and got another bus back to the Lough Mask Inn in Tourmakeady. By the time he returned to the Lough Mask Inn, Francis Carr had already driven off with Orla O'Malley and Sean Halloran. Patrick Hession and Ross McGrath got on to another bus.

Patrick Hession stated:

*'I tried ringing Frank a few times. The last time I rang him a woman answered and said Franks been in a crash and hung up straight away.'*

Patrick Hession does not know who this woman was. According to Patrick Hession:

'*Frank rang me and stayed on the phone about 30 or 40 minutes. He said he didn't know what happened. He was kind of saying he wasn't driving. Frank was talking a lot of rubbish.'*

Gary Hopkins in his cautioned witness statement of the 3rd of June, 1998 stated that he had travelled back to Tourmakeady with Daniel Gibbons, and was in the company of Sean Halloran and Orla O'Malley until 2.30 a.m. on the 4th of June, 2017 approximately, when he got a lift home. Gary Hopkins had met Francis Carr in the bar in the marquee on the 3rd of June, 2017. Gary Hopkins confirmed that Francis Carr was drinking alcohol on the 3rd of June, 2017, whilst in their company and:

'*...again at the that time I knew Frank had a drink on him, he wasn't fully around drunk but he was talking a load of rubbish.'*

Justin Morrin made a cautioned witness statement on the 4th of July, 2017, and had travelled back to Tourmakeady with Daniel Gibbons and was in the company of Sean Halloran and Orla O'Malley. Justin Morrin stated:

'*Around 11 p.m. I met Frank Carr from Tourmakeaddy at the bar'* Justin Morrin stated, '*I think Frank was drinking, Orchard Thieves as well he wasn't overboard drink, just bit excited like.'*

Breffni Anderson in an additional cautioned statement taken on the 28th of September, 2018 was in bed in his holiday home at Gortmore, Tourmakeady, on the morning of 4th of June, 2017. He told investigators:

'*As I stated I was woken at 3.48am by the sound of the car passing my house. It was travelling a speed and high revs. It sounded like it was being driven in a low gear at high revs and was braking coming up to the junction at Maire Lukes. It had a high exhaust note. After I was woken by the noise of the car I opened the external double doors of my bedroom to view what was happening. From this vantage point I saw a dark coloured car rotating at the junction at least five times.'*

Vincent Maree was home in Gortmore, Tourmakeady, County Mayo. According to his cautioned statement of the 13th of June, 2017, on the 4th June 2017. At 3.40 a.m. approximately, he heard a car at the junction to Marie Luke's Bar and Restaurant: '*I heard the car doing donuts at the cross roads for Maire Luke's. This lasted for about five minutes. I*

*heard the car drive off again towards Tormakeady as it was going away I could hear something dragging from the car and I was waiting for it to stop but it did not.*

Thomas Joseph Feeney in his cautioned statement of the 5th of June, 2017, was at his girlfriend's, Laura Mulkerrin's home in Churchfield, Tourmakeady, County Mayo on the 4th of June, 2017. He stated:

*'I remember 4/6/17 myself and my girlfriend got home at about 3am. I was home about 30 minutes when I heard a bang and skidding a couple of seconds before that I knew it was an accident. I looked out the window and saw smoke coming up the road from the crash. I called Laura and went downstairs. There was 3 people in the car and no one was moving.'*

Damien Feeney in his cautioned statement of the 5th of June, 2017, was standing outside the door of his girlfriend Jodie Shoevlin's house, on the 4th June 2017, at 3.30 a.m. approximately at Churchfield, Tourmakeady, County Mayo having a cigarette. He told investigators:

*'We were standing outside the patio door of the house when I heard a car making loud noises which sounded to me like making doughnuts. What I mean bout that is that I heard tyres screeching, throttle of the car revving up and down, this sound of the car seemed to be crossing from the crossroads at Maire Lukes which is a mile or two over the road.'*

Damien Feeney believed this to be coming from the crossroads at the junction of the road R300/L5630 which leads to Maire Luke's public house. Damien Feeney then heard: '*one massive bang*' on the 4th June 2017, at 03.40 a.m. approximately, and surmised from the noise that a serious traffic collision accident had just occurred. He proceeded immediately to the scene with his girlfriend, Jodie Shoevlin.

Upon arrival at the scene, on the 4th June 2017 at 3.40 a.m. approximately, Damien Feeney observed a man in the driver's side, who was groaning. When Damien Feeney checked the front seat passenger, he was deceased. Damien Feeney observed the back seat passenger was not responsive, but breathing. When the driver of the car started to communicate, Damien Feeney slapped him across the face to rouse him. Damien Feeney started calling him '*Frank*' as he believed, that is what his girlfriend, had called him. Damien Feeney had never seen this person before. He helped the driver named Frank from the driver's seat, unbuckled his seatbelt and helped him from the car: *'When I got him out of the car and was walking him across the road, he asked "what happened, it wasn't me"'*. Damien Feeney helped the driver across the road and put him sitting on a step in front of a house.

Caitriona Egan provided a cautioned witness statement on the 11th of June, 2017. She stated, that she decided to go home at 3:45 a.m. on the 4th June 2017, and came across the accident. She came across Francis Carr across the road from the crashed car. He was hysterical, and he gave her a hug, he kept saying:

'*I don't know*' and he also said *'I think that's my car*'. He said *'sorry Catriona'* several times and kept repeating himself.

Francis Carr was treated by a local paramedic, called Pat Shannon, who lived near the scene of the accident, on the 4th June 2017 at 4.09 a.m. until the arrival of ambulance personnel.

CARR_EXT_0017

According to Pat Shannon's cautioned witness statement of the 8th of June, 2017, while Pat Shannon was treating him, Francis Carr told him on the 4th June 2017, that:

'he *was driving the car and had killed all his friends*'.

He told Pat Shannon, he had no insurance to drive. Pat Shannon was a Detective Garda in Galway, until his retirement in September 2017.

Jodie Shoevlin in her cautioned witness statement of the 6th of June, 2017, was at her home in Churchfield, Tourmakeady, County Mayo on the 4th of June, 2017, with her boyfriend Damien Feeney. She told investigators:

'*I heard revving noise from a car and about a minute later I heard a screech and then thud. I thought it was a car crash.*'

On arrival at the accident scene on the 4th of June, 2017, at about 3.40 a.m. only a couple of hundred meters from her house. She realised the collision was serious. Neither she nor Damien Feeney had their mobile phones with them. She ran back to her house and rang 999 from a phone in the house in Churchfield, Tourmakeady, County Mayo at 3.52 a.m. approximately. Ambulance Control stated that they received a call at 03.52 a.m. on the 4th June 2017, in relation to this incident.

Gardaí received a call from ambulance control at 04.06 a.m. on the 4th of June, 2017, informing them of a traffic collision, and that there was a fatality. Garda Patrick Egan, sent Garda Tom Fleming, Garda Katie Conlan, Garda Mark Walkin and Sergeant Margaret O'Connor to the scene at Churchfield, Tourmakeady, County Mayo.

Upon arrival at the scene of the collision on the 4th of June, 2017, Sergeant O'Connor observed a black Lexus Altezza, IS200 registration number 00C10565, crashed at a right angle to the road, with the passenger side of the vehicle, crushed against a farmyard block wall. The front passenger of this vehicle, was a male, who was slumped over towards the driver seat. It was apparent that he was deceased. There was a female passenger in the back seat, who was unconscious.

Sergeant Margaret O'Connor enquired as to who else was in the car, and witnesses at the scene pointed to a male who was sitting on steps on the house across the road. There were people surrounding him, taking care of him. Sergeant O'Connor approached him on the morning of the 4th of June, 2017, and she observed that he was distressed, and had a wound to his head. Sergeant Margaret O'Connor asked him his name, and he said he was Francis Carr. When he was asked by Sergeant Margaret O'Connor was he the driver of the car, he said he didn't know who was driving the car. Francis Carr, did not communicate any further with Gardaí after this. Francis Carr was lying on the ground and being treated by paramedics and people at the scene.

Superintendent Joseph McKenna was contacted by Sergeant Margaret O'Connor at 04.44 a.m. on the 4th of June, 2017, and he proceeded immediately to the scene.

According to Francis Carr Senior, date of birth (14/07/1970) in a cautioned witness statement of the 8th of June, 2017, he arrived at the scene at 4.20 a.m. approximately on the 4th June

2017. Francis Carr Senior informed Garda Fleming that he was the registered owner of the vehicle 00C10565. Francis Carr Senior, stated:

'*At some point on Sunday morning while sitting in the hospital it hit me that it had to be Francis car that was in the accident and if he took the car what was he thinking. or what was he doing? Taking it from the house.'*

Francis Carr Senior, in his statement made to Detective Sergeant Gary McEntee, acknowledged that his son Francis Carr owned the car, and that he had purchased it in February of 2017. Francis Carr Senior stated that his son Francis Carr was unable to obtain insurance for this black lexus vehicle IS200 registration 00C 10565, as the insurance companies were looking for an annual premium of approximately €5000 to insure the vehicle. Francis Carr Senior handed the log book for the Lexus to Detective Sergeant McEntee, along with the driving licence of his son Francis Carr. He also handed over the clothes which his son Francis Carr had been wearing at the time of the collision.

The fire brigade led by the substation officer Michael Vahey, removed the roof and side door of the vehicle on the 4th June 2017 at 4.34 a.m. Two ambulance crews treated the female passenger at this stage, due to the nature of her injuries. Orla O'Malley's handbag was retrieved from the wreckage of the vehicle. From the Handbag the An Garda Síochána established that the female passenger was called Orla O'Malley, d.o.b. (15/08/1998). There was no other identifying paperwork in her handbag. Due to the seriousness of Orla O'Malley's injuries, both ambulance crews travelled in one ambulance with Orla O'Malley to Mayo University General Hospital at 05.08am. on the 4th June 2017. The second ambulance was left at the scene. A third ambulance was dispatched from Clifden, County Galway to treat Francis Carr Junior and transport him to Mayo University General Hospital. Witness statements have been obtained from these first medical responders.

At 05.38 a.m. on the 4th June 2017 Dr. Frank Torres, '*Westdoc'*, arrived at the scene and pronounced the front seat passenger dead. The fire brigade then removed the passenger door in order to gain access to the deceased. Once this was completed, it was possible to obtain identification and confirm his identity. The deceased was Sean Thomas Halloran, d.o.b. 02/08/1996. Sean Thomas Halloran, was from Ballynoonagh, Clonbur, County Galway. The County Coroner Mr. Pat O'Connor, Solicitor, Swinford, County Mayo gave permission on the 4th of June, 2017 at 07.39 a.m. to remove the body of Sean Thomas Halloran from the scene. The body of Sean Thomas Halloran was removed from the scene at 7.40 a.m. on the 4th June 2017, by Michael Kilcoyne of Kilcoyne Funeral Directors, and brought to the mortuary at Mayo University General Hospital. The body of Sean Thomas Halloran was subsequently identified to Sergeant O'Connor by Tom Halloran, Uncle of the deceased. . An autopsy was performed on the 4th June 2017 at 14.00 by Dr. F Bennani at Mayo University General Hospital on Sean Halloran. The autopsy determined that cause of death was due to:

'*multiple injuries including fracture base of skull with subarachnoid haemorrhage and multiple rib fractures sustained in road traffic accident.'*

Orla O'Malley was transferred to Mayo University General Hospital on the 4th June 2017 at 05.08 a.m. where she was stabilised and placed on a life support machine. Tests were carried out on Orla O'Malley on the 5th June 2017. Two doctors tested Orla O'Malley's stem cell activity. At 17.37 p.m. on the 5th June 2017, Dr. Michelle Duggan pronounced Orla O'Malley brain stem dead. mortuary. An autopsy was carried out on her body on the 6th

**14**

June 2017, at 3.30 p.m. by Dr. F. Bennani at Mayo University General Hospital which determined that the cause of death was due to: *'extensive subdural and subarachnoid haemorrhage with fracture base of skull sustained in a road traffic accident.'*

Francis Carr was removed from the scene of the road traffic collision at 05.45 a.m. by an ambulance crew from Clifden, County Galway, and transferred to Mayo University General Hospital. It was not possible to obtain a blood or urine sample from him within the required period of time to test for the level of alcohol in his system. He suffered mild abdominal pain, a fracture to his finger, and bruising to his body. The clothes he was wearing were seized by Detective Sergeant Gary McEntee. Francis Carr was discharged from Hospital on the 9th June 2017. Francis Carr was monitored by both the hospital social worker and the nurse in liaison psychiatry whilst an inpatient.

The scene at Churchfield and the road on either sign of the collision was closed off and preserved, pending a full examination of same.

Garda Sergeant Pat O'Hora, Scenes of Crime Unit, was contacted to examine the scene and he arrived at 07.25 a.m. on the 4th June 2017. Sergeant O'Hora photographed same on the 4th June 2017 at 7.30 a.m. Sergeant O'Hora obtained aerial photographs of the scene and the immediate surrounding roads. The airbag from the steering wheel was seized on the 4th June 2017. A video recording of the road from the junction at Maire Luke's pub to the scene of the traffic collision was made by Garda Hugh McHugh of the Divisional Traffic Unit on the 6th June 2017 at 16.15 and downloaded onto CD.

Sergeant Gabriel McLoughlin, Forensic Collision Investigator, was contacted on the 4th June 2017 to examine the scene and he arrived at 07.55 a.m. Sergeant McLoughlin performed a number of tests and carried out an examination of the vehicle on the 4th June 2017 and the 7th June 2017, which was involved in the road traffic accident. Sergeant McLoughlin noted that: *'the off side rear tyre had cord exposed on the inner shoulder in two sections, which is an offence contrary to Article 55(e) of the Road Traffic (Construction and Use of Vehicles) Regulations 2003.'* Sergeant McLoughlin was unable to establish what speed the vehicle was travelling at prior to the collision. The underskirt of the front bumper of the Lexus Alteeza was found approximately 200 meters from the scene of the collision. Sergeant McLoughlin found: *'the marks on the road show that the Lexus car entered the parking area outside a private residence to a distance of 1m from the broken yellow line on the left hand side of the road. The mark, 8.2 m long was straight, veering back towards the roadway and 0.6m from the broken yellow line a second mark starts. These two marks are critical speed marks and show that the car is out of control. The marks travel on to the road and curved across the road into the grass margin on the right hand side of the road and the near side (passenger side) of the car collides severely into a pillar 3.8m in from broken yellow line. The car travelled 49.5 from the start of the mark in the parking area where it collided with the pillar.'*

Sergeant Peter Hanley conducted house to house enquiries, on the 4th June 2017, throughout the day in Churchfield Upper, Treen and Gortmore, Tourmakeady. From these enquiries a number of witnesses were identified and interviewed.

Francis Carr was voluntarily interviewed, on the 14th June 2017, at the offices of Tom Walsh Solicitor, Castlebar, County Mayo by Gardaí in the presence of his Solicitor Tom Walsh (Lawyer), commencing at 2:00 p.m.

**15**

Francis Carr outlined his background and the events from the morning of the 3rd of June, 2017 to the collision on the 4th of June, 2017. Francis Carr accepted on the 14th of June, 2017, that his:

'*last clear recollection is me going down to Dad to see if he wanted to go to Marguee. Dad said not up to it'* He also stated: *'Cant remember how I got to Marguee. I can hazard a guess that the car was outside and I took it".*

Regarding insurance he said:

'*Didn't try to insure it. It was an investment, was planning to sell it use before the Donegal Rally'*

Regarding his memory:

*'No memory of night. Next memory is of me being anointed in hospital. Woke up. Priest was there wondering what the hell happened.'*

Francis Carr was arrested by Sergeant Margaret O'Connor on Tuesday 20th June 2017 at 9.30 a.m. at his home in Cappaduff Tourmakeady. He was conveyed to Castlebar Garda Station, by Sergeant O'Connor and Sergeant Hugh O'Donnell. Francis Carr was interviewed twice in Castlebar Garda Station by An Garda Síochána on the 20th of June, 2017. His Solicitor, Aoife McCarrick, accompanied him during both interviews. His period of detention was extended whilst being questioned. He told investigators that he still did not have any clear recollection of the collision, but accepted that he was the driver of the vehicle.

Francis Carr was shown CCTV on the 3rd June 2017, on the 3rd of June, 2016 at 8.p.m. which showed him driving into the car park of Marie Luke's licensed premises, and alighting from the driver's side of the car. He identified himself getting out of the car, and he accepted it was him driving the car in the CCTV. It was not possible to identify the passenger that was with him. Witness statements were also read over to him, which outlined what had happened on the night in question. His fingerprints, photograph and a D.N.A. sample were obtained on the 20th June 2017, at Castlebar Garda Station.

The Office of the Director of Public Prosecutions received an investigation file on the 15th of November, 2017 from An Garda Síochána relating to Francis Carr (date of birth 02/07/98) in relation to an allegation of Dangerous Driving causing the death of two persons namely Sean Halloran and Orla O'Malley together with Driving without Driving insurance and failing to produce driving insurance.

Following a full independent consideration of the information on the file directions issued on the 23rd of November, 2017 from the Office of the Director of Public Prosecutions to charge Francis Carr with the following offence: On the 4th of June, 2017 at Churchfield, Tourmakeady, County Mayo, Ireland, Dangerous Driving causing death of Thomas Halloran and Orla O'Malley, contrary to Section 53 (1) of the Road Traffic Act 1961, as amended. The Directions of the 23rd of November also directed a number of summary Road Traffic charges as against Francis Carr. However those charges are not part of this request as the respective penalties are for less than a year imprisonment.

**16**

**(c) The legal description of the offences and statements of the relevant laws and maximum penalties therefor, texts of the law and a statement of the relevant Law.**

Dangerous driving (causing death or serious bodily harm)

Dangerous driving causing death or serious bodily harm is an offence created by Statute under Irish law. Section 53 (1) of the Road Traffic Act 1961, as amended, provides as follows:

53. Dangerous driving

(1) A person shall not drive a vehicle in a public place in a manner (including speed) which having regard to all the circumstances of the case (including the condition of the vehicle, the nature, condition and use of the place and the amount of traffic which then actually is or might reasonably be expected then to be in it) is or is likely to be dangerous to the public.

(2) A person who contravenes subsection (1) commits an offence and—

(a) in case the contravention causes death or serious bodily harm to another person, he or she is liable on conviction on indictment to imprisonment for a term not exceeding 10 years or to a fine not exceeding €20,000 or to both, and

(b) in any other case, he or she is liable on summary conviction to a class A fine or to imprisonment for a term not exceeding 6 months or to both.

(3) In a prosecution for an offence under this section or section 52, it is not a defence to show that the speed at which the accused person was driving was not in excess of a speed limit applying in relation to the vehicle or the road, whichever is the lower, under Part 2 of the Road Traffic Act 2004.

(4) Where, when a person is tried on indictment or summarily for an offence under this section, the jury, or, in the case of a summary trial, the District Court, is of the opinion that he or she had not committed an offence under this section but had committed an offence under section 52, the jury or court may find him or her guilty of an offence under section 52, and he or she may be sentenced accordingly.

(5) Where a member of the Garda Síochána is of opinion that a person has committed an offence under this section, he or she may arrest the person without warrant.

Section 3 of the Road Traffic Act defines the following words as follows:

"Driving" includes "managing" or "controlling".

A "mechanically propelled vehicle" is a vehicle adapted or intended for propulsion by mechanical (including electrical or partly electrical) means.

"public place" as (a) any public road and (b) any street, road or other place to which the public have access with vehicles whether as of right or by permission and whether subject to or free of charge.

Irish case law has held that to establish a charge of dangerous driving causing death or serious bodily harm the prosecution must be able to prove that the defendant was driving in a manner that was dangerous to the public.

The leading case in Ireland on what constitutes dangerous driving is the Circuit court case of The People (Attorney General ) v Quinlan (1962). There the court held that the offence would be established if the defendant was driving "in a manner which a reasonably prudent man, having regard to all the circumstances, would clearly recognise as involving a direct and serious risk of harm to the public".

This statement of the law was subsequently endorsed by the Court of Criminal Appeal in The People (DPP) v Connaughton (2001). Thus the test for dangerous driving is objective in that it is not necessary to prove that the defendant appreciated the risk that his driving was causing.

For a charge of dangerous driving causing death or serious bodily harm it is necessary for the prosecution to prove that the death or serious bodily harm was in fact caused by the defendant's dangerous driving. The prosecution need not prove that the defendant's dangerous driving was the sole cause of the death or serious bodily harm as long as the driving was more than a minimal cause, the prosecution has discharged its burden.

'Serious bodily harm' is a question of fact to be decided in light of the medical and other evidence in each case.

Please see the text of law as attached.

[1961.] *Road Traffic Act,* 1961. [*No.* **24.**] 757

---

*Number* 24 *of* 1961.

---

## ROAD TRAFFIC ACT, 1961.*

---

AN ACT TO MAKE PROVISION IN RELATION TO MECHANICALLY PROPELLED AND OTHER VEHICLES, THE REGULATION AND CONTROL OF ROAD TRAFFIC AND THE USE OF MECHANICALLY PROPELLED VEHICLES FOR THE CARRIAGE OF PASSENGERS, TO MAKE PROVISION FOR COMPULSORY INSURANCE AGAINST LIABILITIES ARISING FROM THE USE OF MECHANICALLY PROPELLED VEHICLES, TO REPEAL THE ROAD TRAFFIC ACT, 1933, AND CERTAIN OTHER ENACTMENTS, TO AUTHORISE CERTAIN CHARGES AND TO MAKE PROVISION FOR OTHER MATTERS CONNECTED WITH THE MATTERS AFORESAID. [*29th July,* 1961.]

BE IT ENACTED BY THE OIREACHTAS AS FOLLOWS :—

## PART I.

### PRELIMINARY AND GENERAL.

**1.**—This Act may be cited as the Road Traffic Act, 1961.  Short title

**2.**—This Act shall come into operation on such day or days as  Commencement may be fixed therefor by any order or orders of the Minister, either generally or with reference to any particular purpose or provision and different days may be so fixed for different purposes and different provisions of this Act.

*The official translation of this Act is printed opposite.

Case: 1:20-cr-00370 Document #: 1 Filed: 07/20/20 Page 50 of 80 PageID #:50

while he is under the influence of intoxicating liquor or a drug to such an extent as to be incapable of having proper control of the vehicle or cycle.

(2) A person who contravenes subsection (1) of this section shall be guilty of an offence and shall be liable on summary conviction, in the case of a first offence, to a fine not exceeding twenty pounds or, at the discretion of the court, to imprisonment for any term not exceeding one month or to both such fine and such imprisonment and, in the case of a second or any subsequent offence, to a fine not exceeding fifty pounds or, at the discretion of the court, to imprisonment for any term not exceeding three months or to both such fine and such imprisonment.

(3) A person liable to be charged with an offence under this section shall not, by reference to the same occurrence, be liable to be charged under section 12 of the Licensing Act, 1872, with the offence of being drunk while in charge, on a highway or other public place, of a carriage.  1872 c. 94.

(4) Where a member of the Garda Síochána is of opinion that a person is committing or has committed an offence under this section, he may arrest the person without warrant.

**52.**—(1) A person shall not drive a vehicle in a public place without due care and attention, or without reasonable consideration for other persons using the place.  Careless driving.

(2) A person who contravenes subsection (1) of this section shall be guilty of an offence.

**53.**—(1) A person shall not drive a vehicle in a public place at a speed or in a manner which, having regard to all the circumstances of the case (including the nature, condition and use of the place and the amount of traffic which then actually is or might reasonably be expected then to be therein) is dangerous to the public.  Dangerous driving.

(2) A person who contravenes subsection (1) of this section shall be guilty of an offence and—

(a) in case the contravention causes death or serious bodily harm to another person, he shall be liable on conviction on indictment to penal servitude for any term not exceeding five years or, at the discretion of the court, to a fine not exceeding five hundred pounds or to both such penal servitude and such fine, and

CARR_EXT_0025

Case: 1:20-cr-00370 Document #: 1 Filed: 07/20/20 Page 51 of 80 PageID #:51

(b) in any other case, he shall be liable on summary conviction to a fine not exceeding one hundred pounds or, at the discretion of the court, to imprisonment for any term not exceeding six months or to both such fine and such imprisonment.

(3) In a prosecution for an offence under this section, it shall not be a defence to prove that the speed at which the accused person was driving was not in excess of an ordinary, built-up area or special speed limit applying in relation to the vehicle.

(4) Where, when a person is tried on indictment or summarily for an offence under this section, the jury, or, in the case of a summary trial, the District Court, is of opinion that he was not guilty of an offence under this section but was guilty of an offence under section 52 of this Act, the jury or court may find him guilty of an offence under section 52 of this Act and he may be sentenced accordingly.

(5) A person liable to be charged with an offence under this section shall not, by reference to the same occurrence, be liable to be charged with an offence under section 35 of the Offences against the Person Act, 1861.

1861, c. 100.

(6) Where a member of the Garda Síochána is of opinion that a person has committed an offence under this section and that the contravention has caused death or serious bodily harm to another person, he may arrest the first-mentioned person without warrant.

**54.**—(1) A person who drives a mechanically propelled vehicle in a public place while there is a defect affecting the vehicle which he knows of or could have discovered by the exercise of ordinary care and which is such that the vehicle is, when in motion, a danger to the public shall be guilty of an offence.

Driving of dangerously defective vehicle.

(2) Where a mechanically propelled vehicle is driven in a public place while there is a defect affecting the vehicle which the owner thereof knows of or could have discovered by the exercise of ordinary care and which is such that the vehicle is, when in motion, a danger to the public, such owner shall be guilty of an offence.

(3) Where a person is charged with an offence under subsection (2) of this section, it shall be a good defence to the charge for him to show that the vehicle was being driven on the occasion in question by another person and that such driving was unauthorised.

Seckcuc Law Libraries

CARR_EXT_0026

Library
**Office of the DPP**
*CERTIFIED TRUE COPY*

0 4 DEC 2018

SIGNED: *Law Librarian*

**Part 3: Material required pursuant to Article VIII, Paragraph 4 of the Treaty on Extradition between Ireland and the United States of America.**

(a) By the original or an authenticated copy of the warrant of arrest, or equivalent order, issued by a competent  authority of the Requesting State;

(b) By the original or an authenticated copy of the complaint, information or indictment; and

(c) In the case of a request from Ireland by a statement of facts, by way of affidavit or statutory declaration, setting forth reasonable grounds for believing that an offense has been committed and that the person sought committed it.

**(a) The original or authenticated copy of the warrant of arrest, issued by a competent authority of the Requesting State**

Please see warrant to arrest as attached.

!EMD OFF!

AN CHÚIRT DÚICHE  THE DISTRICT COURT

No.

**Road Traffic Act 1961**
**Section  Section 53 (1)**

**WARRANT TO ARREST**

Warrant Pulse ID. **1435747**

District Court Area of **Castlebar**

District No. **3**

Prosecutor: Sgt Mary M. O'Connor
Accused: Francis Carr .
WHEREAS a complaint has been made on oath and in writing that you the said accused did
On the  04/06/2017  at  Churchfield Tourmakeady Mayo   a public place in said district
of Castlebar , did drive a vehicle, registered number  00 C 10565  in a manner
(including speed) which having regard to all the circumstances of the case (including the
condition of the vehicle, the nature, condition and use of such place and the amount of
traffic which then actually was or might reasonably be expected then to be therein) was
dangerous to the public, thereby causing the death of another person, namely   Sean
Halloran and Orla O'Malley
Contrary to Section 53(1) of the Road Traffic Act, 1961 as substituted by section 4 of
the Road Traffic (No. 2) Act 2011).
THIS IS TO COMMAND YOU to whom this warrant is addressed to arrest the said Francis Carr
of Cappaduff Tourmakeady Claremorris Mayo  and to bring  him  without any delay before me
or another Judge to be dealt with according to law.

Dated this ..14..... day of ...February...20..18

Signed.................................
**Judge of District Court**

To the Superintendent of the Garda Síochána
At
Castlebar

We hereby certify that the within copy has been
compared with and is a true copy of the original.

Dated the ..26.... day of ..February.. 20..18
Signed....................................

DISTRICT COURT CLERK
DISTRICT COURT OFFICE  BALLINA, CO. MAYO

I certify that this is a true copy
of the original
Signed:......................
Date:....10..12..2018....
Garda/Extradition Section

## (b) The original or an authenticated copy of the complaint, information or indictment

Please see the attached sworn information.

CARR_EXT_0031



**COURTS SERVICE**
*An tSeirbhís Chúirteanna*

Re:  Information regarding Francis Carr

An information to obtain arrest warrants with regard to Francis Carr was sworn by
Sgt. Margaret O'Connor, Castlebar Garda Station on the 14th February 2018 before
Judge Fiona Lydon at Belmullet District Court.

The original warrants remains in the custody and control of Sgt. Margaret O'Connor,
Castlebar Garda Station

Ann Cawley
District Court Clerk
26th February 2018

Oifig na Cúirte Dúiche
2 6 FEB 2018
Ph (098) 72940
Béal an Átha, Co. Mhaigh Eo.

I certify that this is a true copy
of the original
Signed:
Date:
Garda Extradition Section

Case: 1:20-cr-00370 Document #: 1 Filed: 07/20/20 Page 58 of 80 PageID #:58

## AN CHÚIRT DÚICHE  THE DISTRICT COURT

We hereby certify that the within copy has been
compared with and is a true copy of the original.

Dated the ____16"____ day of F.E.A. 20.1.8
Signed _____ Am Carley

No.

**Road Traffic Act 1961**
**Section Section 53 (1)** DISTRICT COURT CLERK
DISTRICT COURT OFFICE, BALLINA, CO. MAYO

### INFORMATION FOR ARREST WARRANT

Belmuller dL
MƠC

Warrant Pulse ID. 1435747
District No. 3

District Court Area of Castlebar

Prosecutor Garda Mary. M. O'Connor
Accused Francis Carr .

THE INFORMATION of Sergeant Mary M O. Connor of Castlebar, who says on oath:-
I am a member of the Garda Síochána of Castlebar Garda Station.
On the 4th June 2017 at 04.06am approximately a report was received at Castlebar Garda
Station of a serious traffic collision involving motor vehicle 00 C 10565 at Churchfield,
Tourmakeady, Co. Mayo, a public place. Upon arrival at the scene I observed a man in the
front passenger seat. It was apparent he was deceased. His name was Sean Halloran.
There was a female in the back passenger seat who was seriously injured. Her name was
Orla O'Malley. She was subsequently pronounced dead on the 5th June 2017 as a result of
injuries received in the traffic collision. There was a man being treated across the
road from the collision by a paramedic. His name was Francis Carr from Cappaduff,
Tourmakeady, Co Mayo. An eye witness at the scene, Damien Feeney, stated that he was the
first person at the scene and had removed Francis Carr from the driver's seat of the
vehicle. A local man who was an advanced paramedic treated Francis Carr at the scene.
In his statement he stated that Francis Carr told him that he was driving the car and had
killed his friends. Francis Carr was subsequently removed from the scene of the traffic
collision by an ambulance crew from Clifden. He was interviewed voluntarily on the 14th
June 2017 by me but he alleged he had no recollection of the traffic collision. Francis
Carr was arrested on the 20th June 2017 by me and questioned in relation to this matter.
Witness statements placing Francis Carr driving his vehicle, and CCTV showing him
alighting from the driver's side of the car, were put to Francis Carr during interview
and he acknowledged that he was driving motor vehicle 00 C 10565 on the 4th June 2017.
Francis Carr admitted that he did not have a valid insurance policy for the car. A file
was prepared and submitted to the office of the Director of Public Prosecution.
Directions were received on the 28th November 2017 to charge Francis Carr with Section 53
(1) (as amended by Section 51 of the Road Traffic Act 1968) and (2)(a) as amended by
Section 49(1) of the Road Traffic Act 1994 and Section 23 of the Road Traffic Act 2002)
of the Road Traffic Act 1961.
I therefore apply for the issue of a warrant of arrest of the accused Francis Carr of
Cappaduff Tourmakeady Claremorris Mayo . .

I certify that this is a true copy
of the original
Signed: _____
Date: _____ 10 17 2016
Garda Extradition Section

CARR_EXT_0033

**(c) In the case of a request from Ireland by a statement of facts, by way of affidavit or statutory declaration, setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it.**

Please see the attached Affidavit setting forth reasonable grounds for believing that offences have been committed and that the person sought committed them.

22

**AFFIDAVIT IN ACCORDANCE WITH ARTICLE VIII (4) (c) OF THE TREATY ON EXTRADITION BETWEEN IRELAND AND THE UNITED STATES OF AMERICA**

I Tom Conlon of Infirmary Road, Dublin 7, Ireland aged eighteen years and upwards make oath and say as follows:

1. I am a Senior Prosecution Solicitor in the Office of the Director of Public Prosecutions in Ireland. The Director of Public Prosecutions enforces the criminal law in the Irish Courts on behalf of the People of Ireland.

2. As a professional officer appointed pursuant to the Prosecution of Offences Act 1974, I am authorised by the Director of Public Prosecutions to act on her behalf in relation to criminal cases. This Affidavit is made based on my capacity as outlined and based on my review of the investigative files.

3. I am the affiant for the "Affidavit in Accordance with Article VIII (4) (c) of The Treaty on Extradition between Ireland and the United States of America" submitted as part of the Extradition Package from Ireland.

4. I say and believe that the Office of the Director of Public Prosecutions received an investigation file on the 15th of November, 2017 from An Garda Síochána who are the Police Service in Ireland relating to Francis Carr (date of birth 02/07/98) in relation to an allegation of Dangerous Driving causing the death of two persons, namely Sean Halloran and Orla O'Malley, together with Driving without Driving insurance, and failing to produce driving insurance.

5. The file forwarded contained witness statements together with various documents and information pertinent to the investigation including a voluntary interview on the 14th of June, 2017 with An Garda Síochána and exhibits (for the purposes of investigating the offences alleged).

6. Following a full independent consideration of the information on the file directions issued on the 23rd of November, 2017 from the Office of the Director of Public Prosecutions to charge Francis Carr with the following offence: Dangerous Driving causing death or serious bodily harm, contrary to Section 53 (1) of the Road Traffic Act 1961, as amended.

7. I say and believe that based on the facts on file averred to in this Affidavit that there are reasonable grounds for believing that the charge as directed was committed by Francis Carr, and that there is sufficient evidence for Francis Carr to stand trial on the charge as directed.

8. An Garda Síochána have confirmed that the required prosecution witnesses are still available and are prepared to give evidence in any such prosecution.

9. I say and believe that it will be necessary for the purposes of prosecuting Francis Carr with the charges as directed to seek his extradition. It is believed that he is presently residing in the United States of America.

10. All representations made in the Statement of Pertinent Facts previously submitted as Part 2(b) of the Francis Carr Extradition Package are based on information that I know directly, through others, and from the files and information that I have reviewed.

11. The facts / representations as set out in the Statement of Pertinent Facts submitted as Part 2(b) of the Francis Carr Extradition package, were obtained from the comprehensive file presented by the investigative team of An Garda Síochána to the Office of the Director of Public Prosecutions. This file contained a large number of statements and documents taken pursuant to the investigation of the alleged offence, the subject matter of the Extradition Request.

12. All representations in the Francis Carr Extradition package namely as contained under Part 1 (a). (b) (c) and Part 2 (a). (b). (c) in addition to Part 3 (a). (b) (c). are based on information that I know directly, through others, and from the files and information that I have reviewed. All attachments to the Francis Carr Extradition package were either produced or received directly by me in the performance of my duties.

13. All representations made in this Affidavit are based on information that I know directly, through others and from the files / information that I have reviewed.

14. On the 14th of February, 2018 Sergeant Mary M O'Connor acting in accordance with directions issued by the Office of the Director of Public Prosecutions obtained a domestic warrant for the arrest of Francis Carr from the presiding Judge at Castlebar District Court District No. 3 in respect of the offence / charge as stipulated in the Extradition Request to the U.S authorities (the subject matter of the Extradition Request submitted by the Irish authorities).

**Sworn** the 3rd day of January 2019
by the said Tom Conlon at the Criminal
Courts of Justice, Parkgate Street, Dublin
8 in the County of the City of Dublin
before me a Commissioner for
Oaths/Practising Solicitor
and I know the Deponent.

**Deponent**

**Commissioner/for Oaths / Practising Solicitor**

Kelly Breen.
Solicitor,
John M. Quinn + Co
Unit 232,
The Capel Building
D7

AFFIDAVIT IN ACCORDANCE WITH ARTICLE VIII (4) (C) OF THE TREATY ON
EXTRADITION BETWEEN IRELAND AND THE UNITED STATES OF AMERICA

I Tom Conlon of Infirmary Road, Dublin 7, Ireland, aged eighteen years and upwards make
oath and say as follows:

1. I am a Senior Prosecution Solicitor in the Office of the Director of Public Prosecutions
   in Ireland. The Director of Public Prosecutions enforces the criminal law in the Irish
   Courts on behalf of the People of Ireland. As a professional officer appointed pursuant
   to the Prosecution of Offences Act 1974, I am authorised by the Director of Public
   Prosecutions to act on her behalf in relation to criminal cases.

2. I make this Affidavit further to the Original Affidavit and in order to supplement the
   Government of Ireland's request for the extradition of Francis Carr.

3. I say and believe that based on my review of the investigatory file which includes an
   Irish Driving licence with a photograph of Francis Carr with a date of birth of 2nd of
   July, 1998, Exhibit 'TC1'. I further say and believe that the person depicted in the Irish
   Driving licence as Francis Carr is the requested person in the extradition package, and
   after speaking with  Sergeant Margaret O'Connor, it is the same person described as
   Francis Carr in the Statement of Facts included in the extradition package.

Sworn the 4 day of December 2018
by the said Tom Conlon  at the *Criminal Court of Justice* in the County of the City of Dublin
before me a Commissioner for Oaths/Practising Solicitor
and I know the Deponent.

Deponent

Commissioner for Oaths / Practising Solicitor

FELISA BEALE

Exhibit "TC1" to the affidavit of Tom Conlon Senior Prosecutor

_____

Tom Conlon Solicitor
Practising Solicitor

Commissioner for Oaths/ _Practising Solicitor_

FEILIM BOYLE

Ex 1



This is a true copy of the Irish Driving
Licence issued to Francis Carr

I certify that this is a true copy
of the original
Signed: _____
Date: 10 12 2011
Garda Extradition Section

CARR_EXT_0039

**Treaty on Extradition between Ireland and the United States of America done at Washington on the 13th of July 1983.**

**Request by Ireland for the Extradition from the United States of America.**



——————————

*Number* 25 *of* 2010

——————————

# ROAD TRAFFIC ACT 2010

——————————

[2010.]    *Road Traffic Act* 2010.    [*No.* **25.**]    Pt.7 S.66

previous offence or, in the case of more than one such offence, the last such offence.

(*b*) Where a person is convicted of an offence under section 52 tried summarily or under section 56, the court may, in the case of a first offence under the section concerned, where it is satisfied that a special reason (which it shall specify when making its order) has been proved by the convicted person to exist in his or her particular case to justify such a course—

(i) decline to make a consequential disqualification order, or

(ii) specify a period of disqualification in the consequential disqualification order of less than 1 year.".

(2) This section stands repealed upon the commencement of *section 65(1)*.

**67.**—(1) Section 29 (inserted by section 7 of the Act of 2006) of the Principal Act is amended by substituting for subsection (4) the following:

*Amendment of section 29 of Principal Act — removal of disqualification and repeal.*

"(4) Where a court considers it to be appropriate the court may—

(*a*) confirm the period specified in the order of disqualification, or

(*b*) order the removal of the disqualification from a specified date that is such that the disqualification will have effect for at least two-thirds of the period specified in the order of disqualification, or a period of 2 years, whichever is the greater.".

(2) Section 19 of the Act of 1968 is repealed.

**68.**—Section 9 of the Act of 2002 is amended:

*Amendment of section 9 of Act of 2002 — disqualification under European Convention on driving disqualifications.*

(*a*) in subsection (9), by inserting "or after the date on which the Convention has become applicable between the State and another Member State, by declaration under Article 15.4 of the Convention, by a person normally resident in that other Member State," after "("State of residence"),

(*b*) in subsection (12)(*a*), by—

(i) in the definition of "the Convention" by substituting "Luxembourg" for "Brussels", and

(ii) inserting after the definition of "specified offence" the following:

" 'state of residence' means the state of residence of a person who has committed a specified offence and to whom this subsection applies.",

and

73

previous offence or, in the case of more than one such offence, the last such offence.

(*b*) Where a person is convicted of an offence under section 52 tried summarily or under section 56, the court may, in the case of a first offence under the section concerned, where it is satisfied that a special reason (which it shall specify when making its order) has been proved by the convicted person to exist in his or her particular case to justify such a course—

(i) decline to make a consequential disqualification order, or

(ii) specify a period of disqualification in the consequential disqualification order of less than 1 year.".

(2) This section stands repealed upon the commencement of *section 65(1)*.

67.—(1) Section 29 (inserted by section 7 of the Act of 2006) of the Principal Act is amended by substituting for subsection (4) the following:

*Amendment of section 29 of Principal Act — removal of disqualification and repeal.*

"(4) Where a court considers it to be appropriate the court may—

(*a*) confirm the period specified in the order of disqualification, or

(*b*) order the removal of the disqualification from a specified date that is such that the disqualification will have effect for a least two-thirds of the period specified in the order of disqualification, or a period of 2 years, whichever is the greater.".

(2) Section 19 of the Act of 1968 is repealed.

68.—Section 9 of the Act of 2002 is amended:

*Amendment of section 9 of Act of 2002 — disqualification under European Convention on driving disqualifications.*

(*a*) in subsection (9), by inserting "or after the date on which the Convention has become applicable between the State and another Member State, by declaration under Article 15.4 of the Convention, by a person normally resident in that other Member State," after "("State of residence"),

(*b*) in subsection (12)(*a*), by—

(i) in the definition of "the Convention" by substituting "Luxembourg" for "Brussels", and

(ii) inserting after the definition of "specified offence" the following:

" 'state of residence' means the state of residence of a person who has committed a specified offence and to whom this subsection applies.",

and

CARR_EXT_0043

(c) in the Second Schedule, in the title, by substituting "Luxembourg" for "Brussels".

## PART 8

### Certain Driving Offences

Inconsiderate, careless and dangerous driving, etc.

**69.**—The following sections are substituted for sections 51A, 52 (inserted by sections 49 and 50, respectively, of the Act of 1968), 53 (as amended by section 51 of the Act of 1968, section 49(1)(b) of the Act of 1994 and section 13 of the Act of 2004), 54 (as amended by section 6 of the Act of 1968) and 55 (as amended by section 52 of the Act of 1968) of the Principal Act:

"Driving without reasonable consideration.

51A.—(1) A person shall not drive a vehicle in a public place without reasonable consideration for other persons using the place.

(2) A person who contravenes subsection (1) commits an offence.

Careless driving.

52.—(1) A person shall not drive a vehicle in a public place without due care and attention.

(2) A person who contravenes subsection (1) commits an offence and—

    (a) in case the contravention causes death or serious bodily harm to another person, he or she is liable on conviction on indictment to imprisonment for a term not exceeding 2 years or to a fine not exceeding €10,000 or to both, and

    (b) in any other case, he or she is liable on summary conviction to a fine not exceeding €5,000.

(3) Where a member of the Garda Síochána is of opinion that a person has committed an offence under this section and that the contravention has caused death or serious bodily harm to another person, he or she may arrest the first-mentioned person without warrant.

Dangerous driving.

53.—(1) A person shall not drive a vehicle in a public place in a manner (including speed) which having regard to all the circumstances of the case (including the condition of the vehicle, the nature, condition and use of the place and the amount of traffic which then actually is or might reasonably be expected then to be in it) is or is likely to be dangerous to the public.

(2) A person who contravenes subsection (1) commits an offence and—

    (a) in case the contravention causes death or serious bodily harm to another person, he or she is liable on conviction

74

on indictment to imprisonment for a term not exceeding 10 years or to a fine not exceeding €20,000 or to both, and

(*b*) in any other case, he or she is liable on summary conviction to a fine not exceeding €5,000 or to imprisonment for a term not exceeding 6 months or to both.

(3) In a prosecution for an offence under this section or section 52, it is not a defence to show that the speed at which the accused person was driving was not in excess of a speed limit applying in relation to the vehicle or the road, whichever is the lower, under Part 2 of the Road Traffic Act 2004.

(4) Where, when a person is tried on indictment or summarily for an offence under this section, the jury, or, in the case of a summary trial, the District Court, is of the opinion that he or she had not committed an offence under this section but had committed an offence under section 52, the jury or court may find him or her guilty of an offence under section 52, and he or she may be sentenced accordingly.

(5) Where a member of the Garda Síochána is of opinion that a person has committed an offence under this section, he or she may arrest the person without warrant.

Driving of dangerously defective vehicle.

54.—(1) Where a mechanically propelled vehicle is driven in a public place while there is a defect affecting the vehicle which the person driving the vehicle and, where the person driving the vehicle is not the owner, the owner of it, knows of or could have discovered by the exercise of ordinary care and which is such that the vehicle is, when in motion, a danger to the public, such person and such owner each commits an offence.

(2) Where a person is charged with an offence under this section, it is a defence to the charge for him or her to show that the vehicle was being driven on the occasion in question by another person and that such driving was unauthorised.

(3) A person who commits an offence under this section is liable on summary conviction to a fine not exceeding €5,000 or to imprisonment for a term not exceeding 3 months or to both.

(4) In a prosecution for an offence under this subsection it is a defence if the defendant shows that on the occasion in question he or she was the employee of the owner and was using the vehicle in obedience to the express orders of the owner.

CARR_EXT_0045

Parking vehicle in dangerous position.

55.—(1) A person shall not park a vehicle in a public place if, when so parked, the vehicle would be likely to cause danger to other persons using that place.

(2) A person who contravenes subsection (1) commits an offence and is liable on summary conviction—

    (*a*) in the case of—

        (i) a first offence, where any part of the period of the contravention was a period within lighting-up hours (as declared by regulations under section 11) during which the vehicle did not fulfil the requirements imposed by law with respect to lighting and reflectors, or

        (ii) a second or any subsequent offence,

to a fine not exceeding €3,000 or to imprisonment for a term not exceeding one month or to both, and

        (*b*) in any other case, to a fine not exceeding €2,000.

(3) Where a member of the Garda Síochána is of opinion that a person is committing or has committed an offence under this section, he or she may arrest the person without warrant.".

Repeals — *Part 8.*

70.—The following are repealed:

    (*a*) section 35 of the Offences against the Person Act 1861,

    (*b*) sections 49 to 52 of the Act of 1968,

    (*c*) section 13 of the Act of 2004, and

    (*d*) the matter at reference numbers 11 to 16 in Part 1 of the Table to section 18 of the Act of 2006.

## PART 9

### MISCELLANEOUS

Definitions — Principal Act.

71.—Section 3(1) of the Principal Act is amended by—

    (*a*) substituting for the definition of "the Minister" the following:

        " 'Minister' means Minister for Transport;",

    and

CARR_EXT_0046

Niall Mc Cann

BAILE ÁTHA CLIATH
ARNA FHOILSIÚ AG OIFIG AN tSOLÁTHAIR
Le ceannach díreach ón
OIFIG DHÍOLTA FOILSEACHÁN RIALTAIS,
TEACH SUN ALLIANCE, SRÁID THEACH LAIGHEAN, BAILE ÁTHA CLIATH 2,
nó tríd an bpost ó
FOILSEACHÁIN RIALTAIS, AN RANNÓG POST-TRÁCHTA,
AONAD 20 PÁIRC MIONDÍOLA COIS LOCHA, CLÁR CHLAINNE MHUIRIS, CONTAE MHAIGH EO,
(Teil: 01 - 6476834 nó 1890 213434; Fax: 094 - 9378964 nó 01 - 6476843)
nó trí aon díoltóir leabhar.

DUBLIN
PUBLISHED BY THE STATIONERY OFFICE
To be purchased directly from the
GOVERNMENT PUBLICATIONS SALE OFFICE,
SUN ALLIANCE HOUSE, MOLESWORTH STREET, DUBLIN 2,
or by mail order from
GOVERNMENT PUBLICATIONS, POSTAL TRADE SECTION,
UNIT 20 LAKESIDE RETAIL PARK, CLAREMORRIS, CO. MAYO,
(Tel: 01 - 6476834 or 1890 213434; Fax: 094 - 9378964 or 01 - 6476843)
or through any bookseller.

€8.89

Wt. 49197. 529. 10/10. Cahill. (X56808). Gr.30-15.

ISBN 978-1-4064-8419-9



*Number* 25 *of* 2010

## ROAD TRAFFIC ACT 2010

### ARRANGEMENT OF SECTIONS

### PART 1

#### PRELIMINARY AND GENERAL

Section

1. Short title, commencement, collective citation and construction.

2. Definitions.

### PART 2

#### INTOXICATED DRIVING OFFENCES

#### CHAPTER 1

*General*

3. Interpretation — *Part 2*.

#### CHAPTER 2

*Intoxicated driving offences*

4. Prohibition on driving mechanically propelled vehicle while under influence of intoxicant or if exceeding alcohol limits.

5. Prohibition on being in charge of mechanically propelled vehicle while under influence of intoxicant or if exceeding alcohol limits.

6. Prohibition on driving animal-drawn vehicle or pedal cycle while under influence of intoxicant.

7. Power of entry.

#### CHAPTER 3

*Roadside breath and impairment testing*

8. Procedure in relation to person required to undergo breath test who cannot produce his or her driving licence.

1

[*No.* **25.**] *Road Traffic Act* 2010. [2010.]

9. Obligation to provide preliminary breath specimen.

10. Mandatory alcohol testing.

11. Preliminary impairment testing.

CHAPTER 4

*Procedure in relation to providing specimen at Garda Síochána station, etc.*

12. Obligation to provide breath, blood or urine specimens following arrest under *Part 2*.

13. Procedure following provision of breath specimen under *section 12*.

14. Obligation to provide blood or urine specimen while in hospital.

15. Procedure regarding taking of specimens of blood and provisions of specimens of urine.

16. Detention of intoxicated drivers where a danger to selves or others.

17. Procedure at Bureau regarding specimens.

CHAPTER 5

*Evidential matters, etc.*

18. Provisions regarding certain evidence in prosecutions under *section 4 or 5*.

19. Written statement by member of Garda Síochána in respect of requirement under *section 12(1)*.

20. Provisions regarding certain evidence in proceedings under *Part 2*.

21. Costs of prosecutions under *Part 2*.

22. Defence to refusal to permit taking of specimen of blood or to provide 2 specimens of breath.

23. Bar to certain defence to charges under *section 4(1), 5(1) or 6(1)*.

CHAPTER 6

*Medical examination at Garda Síochána station or hospital*

24. Medical examination at Garda Síochána station or hospital.

25. Evidential matters.

CHAPTER 7

*Functions of Bureau*

26. Functions of Bureau.

27. Protection of Director, etc., against legal proceedings.

28. Functions of Director.

2

[2010.] *Road Traffic Act* 2010. [*No.* 25.]

CHAPTER 8

*Fixed penalty notice — drink driving*

29. Fixed penalty notice — drink driving.

CHAPTER 9

*Transitional measures*

30. Written statement by member of Garda Síochána in respect of requirement under section 13(1) of Act of 1994.

31. Amendment of section 39(2) of Act of 1994 — power of entry.

32. Amendment of section 5 of Act of 2006 — fixed disqualification notice.

CHAPTER 10

*Repeals (Part 2)*

33. Repeals — *Part 2*.

PART 3

FIXED CHARGE OFFENCES AND NOTICE

34. Fixed charge offences.

35. Fixed charge notice — service.

36. Fixed charge notice — form.

37. Payment of fixed charge.

38. Presumptions.

39. Regulations — information regarding drivers of mechanically propelled vehicles.

40. Offences in relation to fixed charge notices.

41. Regulations — fixed charge amounts.

42. Traffic wardens.

43. Outsourcing.

44. Payment of fixed charge on service of summons.

45. Offence by body corporate.

46. Fixed charge notice — traffic wardens.

47. Interpretation.

48. Transitional measure — onus of proof in respect of named driver and discharge duties of registered owner — section 103(4) of Principal Act.

49. Repeals — *Part 3*.

3

## PART 4

### PAYMENT DEPOSIT

50. Payment deposit from non-resident drivers in respect of certain alleged offences.

51. Prosecution *in absentia.*

52. Regulations (*Part 4*).

## PART 5

### PENALTY POINTS

53. Penalty points — endorsement of points.

54. Amendment of First Schedule to Act of 2002 — penalty points.

55. Probation of Offenders Act 1907 not to apply to penalty point offences.

## PART 6

### DRIVING LICENCE

56. Definitions — driving licence.

57. Matters relating to issue of Irish driving licences and learner permits.

58. Prohibition on applying for Irish driving licence or learner permit where disqualified.

59. Production of driving licence on demand of member of Garda Síochána.

60. Member of Garda Síochána may seize licence in certain circumstances.

61. Production of driving licence to member of Garda Síochána subsequent to commission of road traffic offence.

62. Obligation to give current address to member of Garda Síochána.

63. Production of driving licence to court.

## PART 7

### DISQUALIFICATION

64. Disqualification for holding driving licence.

65. Consequential disqualification orders.

66. Transitional provision — consequential disqualification orders.

67. Amendment of section 29 of Principal Act — removal of disqualification and repeal.

4

[2010.] *Road Traffic Act* 2010. [*No.* 25.]

68. Amendment of section 9 of Act of 2002 — disqualification under European Convention on driving disqualifications.

PART 8

CERTAIN DRIVING OFFENCES

69. Inconsiderate, careless and dangerous driving, etc.

70. Repeals — *Part 8.*

PART 9

MISCELLANEOUS

71. Definitions — Principal Act.

72. Driving or being in charge of a substantially disabled mechanically propelled vehicle.

73. Production of certificate of insurance or guarantee.

74. Signature of applicant — driving licence, etc.

75. Production of test certificate when licensing mechanically propelled vehicle under section 1 of the Finance (Excise Duties) (Vehicles) Act 1952.

76. Amendment of section 47 of Principal Act — offence of exceeding speed limit.

77. Vehicle insurers to provide details of motor insurance policies.

78. Regulatory signs.

79. Duty to give information on demand by member of Garda Síochána.

80. Right to demand name and address, etc., of pedal cyclist.

81. Evidence in relation to speeding and certain other offences.

82. Cost of prosecutions — road traffic offences.

83. Functions of Commissioner of Garda Síochána.

84. Amendment of section 15 of Act of 1968 — increase in certain penalties.

85. Regulations — control of driving instructors.

86. Special speed limits.

87. Exemptions for emergency vehicles.

88. Penalty — supply of mechanically propelled vehicle to minor.

89. Display of local authority permits.

90. Detention of vehicles.

5

[*No.* **25.**]　　　*Road Traffic Act* 2010.　　　[2010.]

91.　Repeal.

92.　Certificates of competency — display of tax disc and test certificate.

————————————

ACTS REFERRED TO

| | |
|---|---|
| Civil Service Commissioners Act 1956 | 1956, No. 45 |
| Civil Service Regulation Act 1956 | 1956, No. 46 |
| Company Law Enforcement Act 2001 | 2001, No. 28 |
| Courts (No. 3) Act 1986 | 1986, No. 33 |
| Criminal Justice (Mutual Assistance) Act 2008 | 2008, No. 7 |
| Dublin Transport Authority Act 2008 | 2008, No. 15 |
| European Communities Act 1972 | 1972, No. 27 |
| Finance Act 1976 | 1976, No. 16 |
| Finance Act 1992 | 1992, No. 9 |
| Finance Act 1993 | 1993, No. 13 |
| Finance Act 1994 | 1994, No. 13 |
| Finance (Excise Duties) (Vehicles) Act 1952 | 1952, No. 24 |
| Fire Services Act 1981 | 1981, No. 30 |
| Freedom of Information Act 1997 | 1997, No. 13 |
| Freedom of Information (Amendment) Act 2003 | 2003, No. 9 |
| Garda Síochána Act 2005 | 2005, No. 20 |
| Licensing Act 1872 | 1872, c. 94 |
| Local Authorities (Traffic Wardens) Act 1975 | 1975, No. 14 |
| Local Government Act 2001 | 2001, No. 37 |
| Medical Practitioners Act 2007 | 2007, No. 25 |
| Nurses Act 1985 | 1985, No. 18 |
| Offences against the Person Act 1861 | 1861, c. 100 |
| Petty Sessions (Ireland) Act 1851 | 1851, c. 93 |
| Probation of Offenders Act 1907 | 1907, c. 17 |
| Railway Safety Act 2005 | 2005, No. 31 |
| Road Traffic Act 1961 | 1961, No. 24 |
| Road Traffic Act 1968 | 1968, No. 25 |
| Road Traffic Act 1994 | 1994, No. 7 |
| Road Traffic Act 1995 | 1995, No. 7 |
| Road Traffic Act 2002 | 2002, No. 12 |
| Road Traffic Act 2003 | 2003, No. 37 |
| Road Traffic Act 2004 | 2004, No. 44 |
| Road Traffic Act 2006 | 2006, No. 23 |
| Road Traffic and Transport Act 2006 | 2006, No. 28 |
| Road Transport Act 1933 | 1933, No. 8 |
| Road Transport Act 1986 | 1986, No. 16 |
| Roads Act 1920 | 1920, c. 72 |
| Roads Act 2007 | 2007, No. 34 |
| Social Welfare Consolidation Act 2005 | 2005, No. 26 |
| Taxi Regulation Act 2003 | 2003, No. 25 |

6



*Number* 25 *of* 2010

## ROAD TRAFFIC ACT 2010

AN ACT TO AMEND AND EXTEND THE ROAD TRAFFIC
ACTS 1961 TO 2007.

[20*th July*, 2010]

BE IT ENACTED BY THE OIREACHTAS AS FOLLOWS:

### PART 1

PRELIMINARY AND GENERAL

1.—(1)  This Act may be cited as the Road Traffic Act 2010.

(2)  This Act comes into operation on such day or days as, by order or orders made by the Minister under this section, may be fixed therefor either generally or with reference to any particular purpose or provision and different days may be so fixed for different purposes and different provisions.

(3)  The Road Traffic Acts 1961 to 2007 and this Act may be cited as the Road Traffic Acts 1961 to 2010 and shall be read together as one.

*Short title, commencement, collective citation and construction.*

2.—In this Act—

"Act of 1968" means Road Traffic Act 1968;

"Act of 1975" means Local Authorities (Traffic Wardens) Act 1975;

"Act of 1994" means Road Traffic Act 1994;

"Act of 2002" means Road Traffic Act 2002;

"Act of 2004" means Road Traffic Act 2004;

"Act of 2006" means Road Traffic Act 2006;

"Minister" means Minister for Transport;

"prescribed" means prescribed by regulations made by the Minister;

"Principal Act" means Road Traffic Act 1961.

*Definitions.*

7

[*No.* **25.**]       *Road Traffic Act* 2010.       [2010.]

PART 2

INTOXICATED DRIVING OFFENCES

CHAPTER 1

*General*

Interpretation —
Part 2.

3.—(1) In this Part—

"analysis" includes any operation used in determining the concentration of alcohol in a specimen of breath, blood or urine, and any operation used in determining the presence (if any) of a drug or drugs in a specimen of blood or urine, and cognate words shall be construed accordingly;

"Bureau" has the meaning assigned to it by section 37(1) of the Act of 1968;

"category", in relation to a vehicle referred to in the definition of "specified person", means a category of vehicle referred to in Regulation 6 of the Road Traffic (Licensing of Drivers) Regulations 2006 (S.I. No. 537 of 2006);

"designated" means designated by a member of the Garda Síochána;

"doctor" means a person registered in the General Register of Medical Practitioners established under section 43(1) of the Medical Practitioners Act 2007;

"first driving licence" means a driving licence issued by a licensing authority to a person who has not previously held a driving licence;

"impairment test regulations" means regulations made under *section 11(3)*;

"impairment tests" means tests prescribed under impairment test regulations;

"intoxicant" includes alcohol and drugs and any combination of drugs or of drugs and alcohol;

"nurse" means a person registered in the register of nurses established under section 27 of the Nurses Act 1985;

"specified person" means a person who at the time of an alleged offence under *section 4* or *5*—

     (*a*) is the holder of a learner permit,

     (*b*) holds his or her first driving licence, for a period not exceeding 2 years from its date of issue,

     (*c*) is the holder of a driving licence licensing the holder to drive a vehicle in the category C, C1, D, D1, EB, EC, EC1, ED, ED1 and W while driving, attempting to drive or being in charge of such a vehicle,

     (*d*) is the holder of a licence to drive a small public service vehicle granted under section 34 of the Taxi Regulation Act 2003 or section 82 of the Principal Act or a person purporting to be such a holder while driving, attempting

8