

**FILED**
7/22/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF FRANCIS CARR | CASE NUMBER: 20 CR 370 |
| | **UNDER SEAL** |

## MEMORANDUM OF EXTRADITION LAW
## AND REQUEST FOR DETENTION PENDING EXTRADITION
## PROCEEDINGS

The United States, in fulfilling its treaty obligations to Ireland, respectfully requests that the fugitive in this case Francis Carr be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Carr should be detained. In short, Carr should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight and that special circumstances exist warranting his release.

## BACKGROUND

Ireland seeks the extradition of Carr to prosecute him for dangerous driving causing the deaths of two victims, Sean Thomas Halloran and Orla O'Malley, in violation of section 53(1) of Ireland's Road Traffic Act 1961, as amended. On February 14, 2018, Irish law enforcement authorities charged Carr with this crime, and a judge for the District Court of Castlebar, Ireland issued an arrest warrant that same day. The Government of Ireland seeks to prosecute Carr based on the following facts:

On June 4, 2017 at approximately 4:06 a.m., Irish police received a report of a serious car crash involving a black Lexus on the R300, a public road, at Churchfield, Tourmakeady, County Mayo, Ireland. Upon arrival at the scene, a responding police officer observed that a black Lexus (registration number 00 C 10565) was located at a right angle to the road and the passenger side of the vehicle was crushed against a farmyard block wall. Two passengers were in the vehicle. Sean Thomas Halloran was in the front passenger seat slumped over and not breathing. Medical authorities determined he died immediately from injuries suffered upon impact. Orla O'Malley was in the back seat seriously injured and unconscious. She was transported by ambulance to a hospital, where hours later medical authorities pronounced her dead as a result of injuries suffered in the crash.

The officer asked witnesses at the scene who else had been in the car, and they pointed to a man who was sitting on the steps of a house across the road. When the officer asked that man for his name, he said he was Francis Carr. Paramedics attended to Carr at the scene and then transported him by ambulance to a hospital, where he was treated for abdominal pain, a fracture to his finger, and bruising to his body.

Further police investigation revealed more evidence. On the evening of June 3, 2017, the Gaelic Athletic Association ("GAA") hosted an Irish Football Tournament at the GAA field in Tourmakeady. At approximately 11:00 p.m. that night, witnesses observed Carr join Sean Halloran, Orla O'Malley, and others at the GAA field. Witnesses said they saw Carr and others socializing and drinking alcohol at the field

2

and the pub across the road, the Lough Mask Inn. Carr and the group remained in the area until approximately 3:15 a.m. to 3:30 a.m. on June 4, 2017. At that time, witnesses observed Carr get into a black Lexus in the pub's parking lot. Witnesses also saw Sean Halloran get into the front passenger seat and Orla O'Malley get into the back seat. Witnesses then observed Carr driving the vehicle from the parking lot at high speed. One witness described it as a "high speed . . . spin take off."

On June 4, 2017 at approximately 3:40 a.m., other witnesses heard the loud sounds of a car engine throttle revving up and down and tires screeching. One witness said he was awakened by a car traveling by his house. He said it sounded like the engine was being driven in low gear with high revs and then sudden breaking at the junction; it had a high exhaust note. When he opened the double doors of his bedroom to see what was happening, he saw a dark colored car rotating five times in the junction at Maire Luke's Bar and Restaurant. Another witness said he was at home at the time. He heard loud sounds as if a car was doing "donuts" at the crossroads for Maire Luke's. The loud donut sounds lasted for about five minutes, and then it sounded as if the car drove off, back towards Tourmakeady. As the car was driving away, this witness could hear something dragging from the car, and he expected the driver to stop but the driver did not. Another witness said he was standing with his girlfriend outside the patio door of her house, and he heard what sounded like a car "making donuts" in the crossroads of the R300/L5630 junction, which leads to Maire Luke's Bar and Restaurant. He then heard the throttle of a car engine going up and down, tires screeching, and a massive bang. Similarly, his friend

said she heard a car engine revving and about a minute later, tires screeching and a loud thud, which sounded like a car crash. This couple immediately rushed to the scene of the crash.

Upon their arrival, the couple saw that it was a serious car crash. The woman ran back to her house to call an ambulance. Her boyfriend stayed at the scene. He saw Carr groaning in the driver's seat and two non-responsive passengers. He unbuckled Carr's seat belt, helped Carr from the driver's seat, and guided him across the street away from the smashed vehicle.

The first paramedic on the scene told officers that Carr admitted that he was driving and said he killed his friends. The paramedic also reported that Carr said he did not have automobile insurance. In a statement to investigators, Carr's father confirmed that Carr owned the black Lexus and did not have automobile insurance.

Forensic tests of Carr's black Lexus and marks at the crash site showed that the car was on the public road, when it skidded out of control into a pillar near a parking area outside a house. In addition, the passenger's side rear tire had cord exposed in two sections on the inner shoulder, which is an offense under Article 55(e) of the Road Traffic Regulations 2003. The underskirt of the front bumper of the car was found approximately 200 meters from the scene of the collision. Authorities were unable to obtain a blood or urine sample from Carr within the required period of time to test for the level of alcohol in his system.

On June 14, 2017, investigators interviewed Carr in the presence of his attorney at the Castlebar police station. Carr admitted that he owned the black

4

Lexus and did not have automobile insurance required by law. Carr maintained that he could not remember what happened on the night of the crash and "guess[ed]" that he drove his own car that night.

On June 20, 2017, police officers arrested Carr at his home in Cappaduff, Tourmakeady and transported him to the Castlebar police station. Carr was photographed and fingerprinted, and interviewed by investigators in the presence of his attorney. Investigators played a surveillance video for Carr. The video shows Carr on June 3, 2017 at 8:00 p.m. driving his black Lexus into Maire Luke's Bar and Restaurant parking lot and getting out of the driver's seat of the car. Investigators also read witness statements to him. Carr maintained that he has no clear memory of much of the night of the crash and accepted that he was the driver of his own car.

The Office of the Director of Public Prosecutions reviewed the matter and on November 23, 2017, issued a directive to charge Carr with dangerous driving causing the deaths of two victims, Sean Thomas Halloran and Orla O'Malley, contrary to section 53(1) of the Road Traffic Act 1961, as amended. On February 14, 2018, Carr was charged with the crime, and the District Court issued the arrest warrant that same day.

Accordingly, Ireland has requested that Carr be extradited pursuant to its extradition treaty with the United States.[1] The United States, in accordance with its

---

[1] The Treaty on Extradition Between the United States of America and Ireland, U.S.-Ir., July 13, 1983, T.I.A.S. No. 10813, and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union

obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Carr's arrest. This Court issued the arrest warrant, and Carr was arrested on July 22, 2020. Carr is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I.   LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.   The limited role of the Court in extradition proceedings

The extradition process is *sui generis.* Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184. The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

---

signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Ireland, U.S.-Ir., July 14, 2005, S. TREATY DOC. No. 109-14 (2006).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Eain*, 641 F.2d at 508 (summarizing extradition procedure). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see also Eain*, 641 F.2d at 508.

## B. The requirements for certification

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See, e.g.*, *In re Extradition of Markey*, No. 3:09-mj-75, 2010 WL 610975, at *1 (N.D. Ind. Feb. 18, 2010). The following sections briefly discuss each of those requirements.

7

      1.    <u>Authority over the proceedings</u>

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by § 3184 does not exercise "any part of the judicial power of the United States," *In re Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1996), but rather is acting in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993). Both magistrate judges and district judges may render a certification under § 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also In re Mazur*, No. 06 M 295, 2007 WL 839982, at * 1 (N.D. Ill. Mar. 25, 2007) (explaining that the Old General Rule 1.70(b)(1)(j) specifically authorized magistrates to hear foreign extradition cases and that its replacement, Local Criminal Rule 5.1, "though not as specific as the old rule, nonetheless authorizes magistrate judges to perform the duties spelled out in § 3184.").

      2.    <u>Jurisdiction over the fugitive</u>

The Court has jurisdiction over a fugitive, such as Carr, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

3. <u>Treaty in full force and effect</u>

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also U.S. v. Nolan*, 651 F. Supp. 2d 784, 790 (N.D. Ill. 2009) (noting that "[e]xtradition is only proper where, as here, there is a treaty in force between the requesting country and the United States"). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Ireland. The Court must defer to the Department of State's determination in that regard. *See Nolan*, F. Supp. 2d at 793.

4. <u>Crimes covered by the treaty</u>

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the Treaty. Article I obligates the United States to extradite to Ireland a fugitive wanted for prosecution or for imposition or enforcement of a sentence in Ireland for an "extraditable offense," as that term is defined under the Treaty. Article II of the Treaty defines offenses as extraditable if the criminal conduct is punishable under the laws of both the United States and Ireland "by imprisonment for a period of more than one year, or by a more severe penalty."

In assessing whether the crime for which extradition is requested is covered by the Treaty, the Court should examine the description of criminal conduct provided

9

by Ireland in support of its charge and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states, if it had been committed here. *See, e.g.*, *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1114 (7th Cir. 1997); *see also In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 883 (N.D. Ill. 2006) ("In assessing the duality of the crimes charged in an extradition proceeding, the Court may refer to either the federal or state law of the United States."). A requesting country need not establish that its crimes are identical to ours. *DeSilva*, 125 F.3d at 1113 ("If there is probable cause to believe that [the fugitive and his co-conspirators] committed a crime in Canada, and there is probable cause to believe that the conduct would have been criminal if committed in the United States, then extradition is appropriate. This is the 'dual criminality' requirement."). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922). As long as "the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States." *DeSilva*, 125 F.3d 1113.

In fulfilling its function under Section 3184, the Court should liberally construe the Treaty in order to effectuate its purpose, namely the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933); *see also,*

*e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"); *In Re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1305 (D. Or. 2013). Accordingly, because extradition treaties should be "interpreted with a view to fulfill our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

        5.    <u>Probable cause that the fugitive has committed the offenses</u>

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by Ireland were committed by the person before the Court. *See Eain*, 641 F.2d at 508. The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

### C.   An extradition hearing follows unique procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding, *see, e.g.*, *DeSilva*, 181 F.3d at 868, and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The Federal Rules of Evidence do not apply to extradition proceedings.  *See, e.g.*, *Bovio v. United States*, 989 F.2d 255, 259 n.3 (7th Cir. 1993); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").   Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government.  *See, e.g.*, *Collins*, 259 U.S. at 317; *Bovio*, 989 F.2d at 259.  Nothing more is required, and typically nothing more is provided.  *See, e.g.*, *Eain*, 641 F.2d at 509 (sworn witness statements is competent evidence).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *see also, e.g.*,

12

*Zanazanian v. United States*, 729 F.2d 624, 626-27 (9th Cir. 1984). The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."). A fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *In re Extradition of Powell*, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998) (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y.

13

1883)).  The admission of explanatory evidence is largely within the discretion of the Court.  *See Markey*, 2010 WL 610975, at *3-4.  In addition, courts routinely reject technical and affirmative defenses in extradition proceedings.  *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality").  These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D.    Rule of non-inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court.  *See* 18 U.S.C. §§ 3184 & 3186.  The Secretary may take into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country.  *See In re Extradition of Salas*, 161 F. Supp. 2d. 915, 927 (N.D. Ill. 2001).  This is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State."  *See In re Kaine*, 55 U.S. 103, 110 (1852).  Similarly, a fugitive's contention that the extradition request is politically motivated, or that the requesting state's justice system is unfair, should be addressed by the Secretary of State, not the Court.  *Prasoprat*, 421 F.3d at 1016 (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch).

14

## II.     CARR SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.  The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[2]  *See Markey*, 2010 WL 610975, at *1; *United States v. Wroclawski*, 574 F. Supp. 2d 1040, 1044 (D. Ariz. 2008).   Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.     Applicable law

1.     <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "there is a presumption that no bail should be granted" in extradition cases.  *United States v. De Loera*, No. 2:06-MJ-98, 2006 WL 1518981, at *2 (N.D. Ind. May 31, 2006).   The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign

---

[2] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts.  *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, Carr is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed in violation of the law of the requesting state, Ireland.

government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. 40, 62 (1903).

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *See also Wright*, 190 U.S. at 62; *De Loera*, 2006 WL 1518981, at *2. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond.

      2.    <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight

16

risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *In the Matter of Extradition of Molnar*, 182 F. Supp. 2d 684, 687 (N.D. Ill. 2002) ("Whether defendant is, or is not, a risk of flight is not a matter that falls within the ambit of 'special circumstances' determinations."); *Matter of Extradition of Rouvier*, 839 F. Supp. 537, 539 (N.D. Ill. 1993) ("Only the presence of special circumstances will justify the granting of bail."); *see also U.S. v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 55 (D. Mass. 2010) (fugitive must show that he is neither a risk of light nor a danger to any person or the community).[3] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In the Matter of the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in

---

[3] Courts have placed different burdens of proof on fugitives when demonstrating the existence of "special circumstances." *Compare In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1214-15 (D. Nev. 1993), *with In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1036 n.4 (C.D. Cal. 2006). Other courts have found it unnecessary to resolve the issue because of the difficulty of satisfying either standard. *See, e.g.*, *Matter of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016). The Seventh Circuit has not specifically addressed this burden of proof.

foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee").  Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See, e.g.*, *Molnar*, 182 F. Supp. 2d at 687.  Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.  *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition."  *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996) (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)).  Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *Kin-Hong*, 83 F.3d at 525;

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *Beresford-Redman*, 753 F. Supp. 2d at 1089; *Matter of Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

18

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g., Matter of Extradition of Noeller*, No. 17-cr-664, 2017 WL 6462358, at *8-9 (N.D. Ill. Dec. 19, 2017); *Matter of Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1301-02 (S.D. Fla. 2017); *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g., Matter of Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1071-72 (C.D. Cal. 2017); *Matter of Knotek*, No. LA CV 13-9204, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g., Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g., In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g., Salerno*, 878 F.2d at 318; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see, e.g., Antonowicz,* 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B.     Analysis

The Court should detain Carr without bond, in part, because he is a flight risk. As an initial matter, a fugitive charged with crimes in another country is by definition in flight or deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution in his home country is indicative of his risk of flight were he to be released on bond here. *Noeller,* 2017 WL 6462358, at *3. In the context of determining whether a defendant poses a substantial risk of flight, there is no meaningful distinction between a person who left a country when he learned of pending charges and one who already outside that country refuses to return to face these charges. The intent is the same—the avoidance of prosecution. *Id.* (citing *Jhirad v. Ferrandina,* 536 F.2d 478, 483 (2d Cir. 1976)). Thus, one who has left a country pending criminal charges is a likely flight risk in the country to which he has fled.

Here, Carr has indicated his willingness to cross international boundaries to avoid prosecution. Before Carr left Ireland, Irish police had conducted a full investigation and had arrested and released Carr pending the prosecutor's charging decision. Without waiting for the outcome of the prosecutor's review, Carr fled Ireland, thus far avoiding prosecution. Therefore, allowance of bail in any amount would not guarantee Carr's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

Carr's risk of flight alone is sufficient for the Court to deny any forthcoming application for bail. In addition to his flight risk, Carr is a danger to the community.

Significantly, the offense charged in Ireland is serious and lead to the deaths of two victims. However, even if the Court were satisfied that Carr is not a flight risk nor a danger to the community here or abroad, the government is unaware of any "special circumstances" that would justify bail in this case. Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to Ireland, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

III.    **CONCLUSION**

For the foregoing reasons, the United States requests that Carr be detained pending resolution of this extradition proceeding.


Dated: July 22, 2020                    Respectfully submitted,

                                        JOHN R. LAUSCH, JR.
                                        United States Attorney


                                By:     _/s/ Jasmina Vajzovic_
                                        Jasmina Vajzovic
                                        Assistant United States Attorney
                                        219 S. Dearborn Street, Rm. 500
                                        Chicago, Illinois 60604
                                        (312) 469-6233

21