IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF FRANCIS CARR | No. 20 CR 370 <br><br> Magistrate Judge Beth W. Jantz |

**MEMORANDUM OPINION AND ORDER**

Pursuant to agreements between the Government of Ireland and the United States, Ireland has requested that the United States extradite Francis Carr to Ireland to face a charge of dangerous driving causing the deaths of two persons.[1] The Court bifurcated the extradition proceedings at the parties' request, and at issue now is whether the offense with which Carr is charged is extraditable under the treaty. [See dkt. 17.] For the reasons discussed below, the Court finds that the Government has shown that the charged crime for which extradition is requested—dangerous driving causing the death of two persons—is covered by the treaty and thus extraditable.

---

[1] Extradition between the two countries is governed by (1) the Treaty on Extradition between the United States of America and Ireland, U.S.-Ir., July 13, 1983, T.I.A.S. 10813, and (2) the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Ireland signed July 1983, S. TREATY DOC. No. 109-14 (2006). For ease of reference, the Court refers collectively to these documents as "the treaty" throughout this Memorandum Order and Opinion.

## BACKGROUND

The following allegations are drawn from the Irish charge now pending against Carr, the accompanying extradition request documents, and the parties' filings with this Court.

In June 2017, in Ireland, Carr crashed his car into a pillar, resulting in the deaths of his two passengers. [Dkt. 22-1, Exh. 1 to Gov't's Mem., Extradition Request Docs., 33–40.] According to witnesses, Carr drove his car away from the lot of a local pub at a high speed and then, approximately ten minutes later, other witnesses heard what sounded like a car doing donuts, followed by a crash. [Dkt. 22-1 at 33–40.] A witness went to the scene of the crash and pulled Carr out of the driver's side of his Lexus. [Dkt 22-1 at 36.] A police officer who arrived on the scene observed a black Lexus positioned "at a right angle to the road, with the passenger side of the vehicle, crushed against a farmyard block wall." [Dkt. 22-1 at 37.] One of the passengers died upon impact, and the other passenger died several hours later from injuries suffered in the crash. [Dkt. 22-1 at 38–39.] Scene witnesses pointed to Carr, who was sitting on house steps across the street, as another person who had been in the car. [Dkt. 22-1 at 37.] Carr told a paramedic that he was driving and said that he "had killed all his friends." [Dkt. 22-1 at 36–37.] He was later taken to the hospital for treatment of his injuries, but no tests were done to establish the level of any alcohol in his system. [Dkt. 22-1 at 39.]

On February 14, 2018, Carr was formally charged with dangerous driving causing the deaths of two victims, in violation of Ireland's section 53(1) of the Road

2

Traffic Act of 1961, as amended, and the District Court Area of Castlebar, Ireland, issued a warrant for his arrest. [Dkt. 22-1 at 49–52.] In Ireland, dangerous driving causing the deaths of two victims carries a punishment of up to ten years in prison. [Dkt. 22-1 at 30 (statement of facts), 44 (text of Irish statute).]

On January 30, 2019, pursuant to the extradition treaty between Ireland and the United States, Ireland submitted a formal request through diplomatic channels for Carr's arrest and extradition. [Dkt. 22-1 at 4–5 (letter requesting extradition).] An Assistant Legal Adviser for the Department of State has declared that the treaty between the United States and Ireland is in full force and effect, and that the offense for which extradition is sought is extraditable under Article II of the treaty. [Dkt. 22-1 at 1–3 (declaration of Tom Heinemann).] On July 20, 2020, this Court issued an arrest warrant, and Carr was taken into custody on July 22. [Dkts. 5, 8.] In a written opinion on August 18, 2020, the Court ordered Carr detained without bail pending the outcome of these proceedings, and the District Court subsequently affirmed that detention upon Carr's appeal. [Dkts. 19, 33.]

At the parties' request, the Court bifurcated the extradition proceedings, first ordering briefing on the issue regarding the scope of the treaty between the United States and Ireland. [Dkt. 17.] Following the completion of briefing, the Court held oral argument on that issue on October 2, 2020. [Dkt. 39.] As with the bail decision, the Court commends both counsel for their helpful briefing, thorough and thoughtful oral arguments, and vigorous representation of their respective clients.

## DISCUSSION

### I. Framework of extradition proceedings

International extradition proceedings are governed by 18 U.S.C. §3184, under which a judicial officer "must decide whether to certify to the executive branch that the treaty requirements for extradition are satisfied." *Matter of Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562, at *2 (N.D. Ill. Oct. 3, 2018). In determining whether extradition is appropriate, the Court looks at whether (1) the judicial officer has jurisdiction to conduct the extradition proceedings; (2) the Court has jurisdiction over the defendant; (3) the relevant treaty is in full force and effect; (4) the crime for which extradition is requested is covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause that the defendant committed the offense. *Id.*

In this case, Carr's counsel confirmed during oral argument that Carr does not contest the first three requirements, and the Court finds that they are easily met. First, federal magistrate judges are explicitly authorized by §3184 to consider extradition, and second, the Court has jurisdiction over Carr because he was arrested and is presently in custody in the Northern District of Illinois. *See* 18 U.S.C. §3184; *Schumann*, 2018 WL 4777562, at *3. Third, Carr does not dispute the declaration of the Department of State's legal advisor that the treaty between the United States and Ireland is in full force and effect. [See dkt. 22-1 at 1–3.]

As planned, the Court reserves ruling on the fifth and final requirement—whether there is sufficient evidence to support a finding of probable cause—for a later hearing after briefing from the parties regarding any discovery and evidentiary issues. At issue now is whether the Government has established the fourth requirement—that the crime for which extradition is sought is covered by the treaty; in other words, if it is an "extraditable offense."

## II. The charged crime is covered by the treaty and is therefore an extraditable offense.

The Government argues that the treaty defines an extraditable offense as one for which there is "dual criminality," meaning that, as relevant here, the defendant's alleged ***conduct*** is punishable in both countries by a period of imprisonment of one year or more. [Dkt. 22, Gov't's Mem., 6.] Under this approach, the Court need only look at the alleged ***acts*** constituting the "offense" and determine whether they would be a felony in both the United States and Ireland; the names and elements of the offenses do not have to match. [Dkt. 22 at 6–9.] *See generally DeSilva v. DiLeonardi*, 125 F.3d 1110, 1113 (7th Cir. 1997) ("If there is probable cause to believe that [the defendants] committed a crime in Canada, and there is probable cause to believe that the conduct would have been criminal if committed in the United States, then extradition is appropriate. This is the 'dual criminality' requirement. . . . If the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States.") The Government maintains that Carr's conduct underlying the dangerous-

5

driving charge in Ireland qualifies as extraditable because it is punishable under United States federal law as involuntary manslaughter, 18 U.S.C. §1112, which has a potential maximum penalty of 8 years in prison, or under Illinois law as reckless homicide while driving a motor vehicle, 720 ILCS 5/9-3(a) (Class 3 felony); 730 ILCS 5/5-4.5-40(a), which has a potential maximum penalty of 5 years in prison. [Dkt. 22 at 10–11.]

Carr concedes that, if the Court applies only this one-step dual criminality analysis, then that standard has been satisfied in this case and the charged crime here would therefore be extraditable, because Carr's alleged conduct is punishable by a year or more in prison in both countries. [See dkt. 31, Carr's Resp., at 11.] But he maintains that this particular treaty's language imposes an ***additional*** requirement beyond dual criminality—that is, the charged offense's ***legal elements***, not just the alleged acts involved, must be punishable as a felony in both the United States and Ireland. [Dkt. 31.] Thus, he argues that, because the Irish offense of dangerous driving provides for a mens rea lower than "gross negligence"—which is what is required for involuntary manslaughter or reckless homicide in the United States and Illinois, 18 U.S.C. §1110(b); 730 ILCS 5/5-4.5-40(a)—the charged crime in Ireland would be a misdemeanor in the United States, and therefore is not an extraditable offense under the treaty. [Dkt. 31 at 15–18; see dkt. 22-1 at 41–42 (Ireland's statement regarding relevant law) (explaining that to establish an Irish charge of dangerous driving, a defendant must have acted "in a manner in which a reasonably prudent man, having regard to all the circumstances, would clearly

6

recognise as involving a direct and serious risk of harm to the public") (internal quotation marks omitted).]

Because Carr concedes that the dual criminality requirement is met in this case, the Court focuses its analysis on whether the treaty imposes any additional requirement that the legal elements of the charges constitute felonies in both the United States and Ireland. For the several reasons that follow, the Court concludes that the treaty does not impose a further prerequisite beyond dual criminality, and thus Carr has been charged with an extraditable offense covered by the treaty.

### A. General principles of treaty interpretation

Treaties are to be construed liberally so as to promote the fulfillment of treaty obligations, so where a provision "fairly admits of two constructions," the more liberal one is "preferred." *Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933). In the extradition context, a liberal construction is particularly favored, and thus, an extradition treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Id.* at 298.

Interpretation of a treaty "begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008); *see also Air France v. Saks*, 470 U.S. 392, 396–97 (1985). "The clear import of treaty language controls unless "'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) (quoting *Maximov v. United States*, 373 U.S. 49, 54 (1963)). When interpreting a treaty, the negotiation and drafting history of the treaty as well as

7

the "postratification understanding" of the signatories can be used as "aids to its interpretation." *Medellin*, 552 U.S. at 507 (internal quotation marks omitted).

### B. This treaty's language

Turning to this treaty's text, the Court begins with Article II, which covers "Extraditable Offences." As relevant here, section 1 provides that "[a]n ***offence*** shall be an extraditable offence only if it is punishable under the law of both Contracting Parties by imprisonment for a period of more than one year, or by a more severe penalty. . . ." [Dkt. 22-1 at 11 (text of the treaty) (emphasis added).] Subsection 2(a) further explains that it makes no difference "whether the laws of the Contracting Parties place the offence within the same category of offence or denominate the offence by the same terminology . . . ." [*Id.*]

Carr points to the following in arguing that, given the language of this particular treaty, the analysis should have a second step or additional requirement beyond just dual criminality in order to also compare the legal elements of the Irish and American charges. First, Carr contends that the treaty uses "offence"[2] in Article II and throughout the treaty to refer to "the legal elements of the charge." [Dkt. 31, Carr's Resp., 3–8.] He cites that the language does not mention acts or conduct but instead speaks in broad terms about "an offence punishable under the Law" [*sic*] and argues that subsection 2(b)'s "carve-out for jurisdictional elements" would be "superfluous" if the elements of the offenses did not need to match.

---

[2] The treaty uses the Irish spelling of "offence." When quoting from the treaty, this opinion will maintain that spelling, but will otherwise use the American spelling of "offense."

[Dkt. 31 at 3, 5–7.] Carr also cites to Article XI and Article VIII as examples of sections where, in his view, "offence" is clearly used to mean the legal definition of the crime. [Dkt. 31 at 3–6.] Additionally, Carr contends that a natural reading of "offence" is that it refers to "the crime as generally committed," relying on Supreme Court precedent in cases involving interpretation of domestic criminal statutes. [Dkt. 31 at 3–5 (quotation marks omitted).] He further argues that the Court should apply in this treaty context what is known as the "categorical approach" from those domestic criminal cases, and that that approach focuses on the elements that an offense normally entails, rather than the alleged conduct in a particular instance. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1217–18 (2018). [Dkt. 31 at 3–6.]

Starting with Carr's invocation of the "categorical approach," Carr's counsel forthrightly acknowledged during oral argument that he was not aware of any precedent for applying the categorical approach in the context of treaties, and this Court has not found any either. Indeed, the categorical approach is a poor fit for treaty interpretation for two main reasons. First, unlike criminal statutes which are to be read narrowly in order to protect defendants' rights—on the flip side— treaties are construed more liberally with a view toward fulfilling reciprocal treaty obligations. *See Factor*, 290 U.S. at 298 (explaining that treaties should be construed more liberally than criminal statutes and rules of procedure); *see also In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 948–49 (N.D. Ill. 2011) (ordering extradition to Poland when accused was charged with driving under the influence of

9

alcohol and causing a traffic accident that resulted in deaths). Applying an elements-based categorical approach that was developed to analyze criminal statutory questions would thus seemingly be at odds with ensuring that a treaty is given its full effect.

Second, relying on what meaning United States' domestic law alone has given the word "offense" would ignore that the treaty was drafted as a ***joint*** effort between the United States and Ireland, and that the countries' ***mutual*** understanding of the term is what should control. *See Air France*, 470 U.S. at 399–400 ("[I]t is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties"). Thus, the Court holds that the categorical approach is not applicable in this extradition treaty context.

As for this treaty's language to which Carr cites, a reading of the treaty does not make it plain or clear that it uses "offence" in a necessarily elements-based sense. The treaty never defines the term "offence"—not even in section 1 of Article II where it defines "extraditable offence"—and Article XI and Article VIII upon which Carr relies do not further clarify its meaning in any particular way. [See dkt. 22-1 at 11, 13–17.] At most, those articles show that "offence" can have different meanings depending on the context. For example, in Article XI, the treaty uses the term to refer to the generic crime, providing that when the description of an offense is changed after extradition, "the offence" must be "composed of the same constituent elements as the offence for which extradition was granted." [Dkt. 22-1

10

at 16.] In Article VIII, however, the treaty uses "offence" both when discussing the "facts of the case" and "the legal description" of the offence, which dual use shows that the term may be elements-based or acts-based depending on the context. [Dkt. 22-1 at 14, ¶¶ 3(b), (c).]

Further, immediately following the definition of "extraditable offence," subsections 2(a) and 2(b) explicitly state to ignore elemental differences such as whether the offenses are labeled the same or whether there are similar jurisdictional requirements. [Dkt. 22-1 at 11.] Contrary to Carr's argument that subsection 2(b) is redundant if "offence" is not being used in the generic sense, [dkt. 31 at 5–7], subsections 2(b)'s admonishment to ignore the United States federal law's jurisdictional requirements can be read as simply making explicit the notion that elements do not matter in determining whether an offense is extraditable. Overall, subsections 2(a) and 2(b) read together suggest that the contracting parties intended the treaty to apply broadly rather than for extradition to be limited by elemental differences in the countries' differing criminal codes.

Carr also relies on language in three cases to support his position that an additional requirement beyond dual criminality exists, [dkt. 31 at 9], but none of them persuade the Court that such a distinction can be supported. First, Carr cites language from *Arias Leiva*: "*In addition to finding a treaty offense,* the determination of extraditability requires that the doctrine of 'dual criminality' be satisfied." *Aria Leiva v. Wilson*, No. 17-23938-CIV, 2018 WL 9662551, at *15 (S.D. Fla. Sept. 6, 2018), *report and recommendation adopted*, No. 1:17-CV-23938-

11

JLK, 2018 WL 9662549 (S.D. Fla. Oct. 5, 2018), *aff'd sub nom. Arias Leiva v. Warden*, 928 F.3d 1281 (11th Cir. 2019) (emphasis added). That case, however, did not describe how determining whether a charged crime is a treaty offense meaningfully differs from the dual criminality standard; instead, the court analyzed whether the defendant's *"acts"* were criminal in both jurisdictions. *See Arias Leiva*, 2018 WL 9662551, at *16–17 (emphasis added).

Similarly, although the court in *Ramnath* also described dual criminality as two separate requirements—that the charged crime must be both covered by the treaty and considered a crime by both countries—it went on to explicitly state that the elements of the crimes do not need to be "precisely identical," and focused instead on the "*essential character of the criminal transaction.*" *United States v. Ramnath*, 533 F. Supp. 2d 662, 673 (E.D. Tex. 2008) (emphasis in original).

Lastly, Carr's third cited case, *Platko*, is inapposite because, in that case, the treaty at issue specifically listed extraditable offenses rather than provide a catch-all provision, as does the treaty at issue here. *See In re Extradition of Platko*, 213 F. Supp. 2d 1229, 1235 (S.D. Cal. July 26, 2002). [*Cf.* dkt. 22-1 at 11 (text of treaty).] Thus, the *Platko* court first considered whether the charged crime was a listed offense, and second, turned to the question of "dual criminality." *Id.* at 1235–36. Separating those two inquiries made sense there, but it does not suggest that any additional requirement must be satisfied when treaties have a broad definition of "extraditable offense" instead of a list of specific offenses.

12

The Government for its part argues in support of a broad interpretation of "offence," and contends that Article II is better read together as simply incorporating the dual criminality standard. [Dkt. 22 at 6–9.] Under that standard,

> [t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if ***the particular act charged*** is criminal in both jurisdictions.

*Collins v. Loisel*, 259 U.S. 309, 312 (1922) (emphasis added); *see also DeSilva*, 125 F.3d at 1113.

As the Government points out, other courts—which admittedly were not addressing in those cases Carr's unique textual argument here—have interpreted this same United States-Ireland treaty as providing for just a dual criminality requirement. *See In re McCabe*, 10–XR–90622 NJV, 2011 WL 723561, at *10–11 (N.D. Cal. Feb. 22, 2011); *Markey v. U.S. Marshal Serv.*, No. 3:10-CV-61 RM, 2010 WL 1541176, at *2–3 (N.D. Ind. Apr. 16, 2010). Even if not directly on point, these cases are persuasive evidence that a fair reading of the treaty is that there is no additional requirement or step beyond determining dual criminality based on the charged acts. *See McCabe*, 2011 WL 723561, at *10 (in discussing extraditability under the US-Ireland treaty, "the elements of the crime in both countries also need not be the same").

Furthermore, even assuming that the treaty could be read to require the elements of the offenses to match, Carr's more onerous reading still would not prevail. The treaty's plain text may be overridden if giving the words their more

13

usual meaning would cause a result that was "'inconsistent with the intent or expectations of its signatories.'" *Sumitomo*, 457 U.S. at 180 (quoting *Maximov*, 373 U.S. at 54). And if "two constructions" can be fairly gleaned from the treaty's text, "the more liberal construction is to be preferred." *Factor*, 290 U.S. at 293–94. As discussed above, deriving two meanings from the word "offence" is—at best for Carr—possible here. In that event, the Court must opt for the broader reading of the treaty.

For all of these reasons, the Court therefore concludes that the treaty's language merely requires dual criminality, rather than additionally mandating that the offense's elements also constitute felonies in both countries.

### C. Secondary aids to interpretation of this treaty

Although Carr argues that the Court's analysis should end with the "clear" text of the treaty, [dkt. 31 at 9], the Court finds it appropriate to also consider secondary aids to interpretation because, as just explained, this is not a case in which the text is unambiguously in his favor. *Cf. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989) (rejecting reference to secondary materials where text was clear). Indeed, the Supreme Court has frequently considered "the history of the treaty, the negotiations, and the practical construction adopted by the parties" to ascertain a treaty's meaning and to "resolve ambiguities in the text." *Air France*, 470 U.S. at 396, 400 ("In interpreting a treaty it is proper, of course, to refer to the records of its drafting and negotiation."); *see also GE Energy Power Conversion*

*France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645–48 (2020); *Medellin*, 552 U.S. at 507–13.

The secondary evidence is further inconsistent with Carr's reading of the treaty. In this case, the position that the treaty requires only dual criminality is supported by the Executive Branch's materials regarding this treaty, as follows.

As an initial matter, the United States' interpretation of its treaty is "'entitled to great weight.'" *Medellin*, 552 U.S. at 513 (quoting *Sumitomo*, 457 U.S. at 184–85); *but cf. GE Energy,* 140 S. Ct. at 1647 (noting that this may be an open question, but not reaching it in that case). In this case, the Department of State's previous determination that Carr's offense is extraditable under the treaty, [dkt. 22-1 at 3 (declaration of adviser)], therefore should be afforded deference. *See, e.g., In re Extradition of Velasquez Pedroza*, No. 19MJ1696-RBB, 2020 WL 549715, at *6 (S.D. Cal. Feb. 4, 2020).

Additionally, both the President and the Senate recognized at the time of the treaty's ratification in 1984 that the treaty was incorporating a commonly used, one-step dual criminality approach, and tellingly mentioned no step or requirement past that. The President's letter transmitting the treaty to the Senate for ratification describes Article II as adopting "the modern practice of permitting extradition for any crime punishable under the laws of both contracting Parties for a minimum period" and as "also follow[ing] the practice of recent United States extradition treaties in indicating that **the dual criminality standard should be**

15

*interpreted liberally* in order to effectuate the intent of the Parties that fugitives be brought to justice. . . ." [Dkt. 22-2, Exh. 2 to Gov's Mem., at 2 (emphasis added).]

The United States Senate Committee Report on this treaty also echoes that understanding of just a one-step, liberal approach:

> To avoid any problems stemming from the use of different terminology to define offenses and the placement of offenses in different categories in Ireland and the United States, Paragraph 2(a) follows the practice of all recent United States extradition treaties in indicating that the dual criminality standard should be interpreted broadly in order to effectuate the intent of the Treaty to maximize each country's ability to bring to trial and punish fugitives from justice who seek haven in the other country.

[Dkt. 36-5, United States Senate Committee Report (June 20, 1984), at 3.]

Carr parses these materials and contends that they support the existence of another requirement beyond dual criminality, in part because the transmittal letter discusses the requirement that the crime be punishable for a year or more in each jurisdiction before explicitly discussing dual criminality. [Dkt. 31 at 9–11.] But this strained reading of the text misses the broader picture of these documents. In each, the focus is an emphasis on a broad application of the treaty, which indicates that imposing an implicit, additional, and potentially onerous requirement beyond dual criminality was not what the parties intended. Instead, these materials provide further support for liberally construing the treaty to only necessitate that Carr's alleged conduct be punishable as a felony in both countries, rather than requiring a technical match between the elements of the charged crimes in the United States and Ireland.

16

### D. Other extradition treaties

Both parties compare and contrast other extradition treaties to the treaty at issue here to support their reading. [Dkt. 31 at 7–8, 12–15; Dkt. 36, Gov't's Reply, at 4–6.] The Court appreciates the broader context that these materials offer and the parties' work to cite them, but declines to place any deciding weight on these comparisons in this particular case, for two reasons.

First, the focus here should be on what these signatory nations meant in *this* treaty, rather than what was meant in other treaties by other signatories. *See, e.g., Medellin*, 552 U.S. at 507 (providing that in a treaty analysis, drafting history and signatory nations' understanding of the treaty may be considered); *Air France*, 470 U.S. at 396–400 (explaining that it is courts' "responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of *the contracting parties*") (emphasis added). Second, and relatedly, the parties have not cited cases in which courts have engaged in this type of comparative treaty analysis in order to determine the meaning of a ***particular*** treaty. Thus, looking to the language of other treaties and what other countries intended by that language is of limited utility in this case.

\* \* \* \* \*

For all of the reasons above, the Court therefore determines that the United States-Ireland treaty requires only dual criminality for an offense to be extraditable, meaning that just the ***charged conduct*** must be criminal and punishable by a year or more in prison in both jurisdictions.

17

Here, that requirement is met, as Carr concedes, [dkt. 31 at 11]. Carr allegedly drove in such a grossly negligent manner—at a high rate of speed and doing donuts—that he caused a crash and the deaths of his two passengers. [Dkt. 22-1 at 33–40.] In Ireland, the offense of dangerous driving causing death of two victims is punishable by up to 10 years in prison. [Dkt. 22-1 at 30 (statement of facts), 44 (Irish statute).] And in the United States, Carr's conduct could be charged as a felony under United States federal or Illinois state law, as involuntary manslaughter under 18 U.S.C. §1112 (maximum penalty of 8 years in prison), or as reckless homicide while driving a motor vehicle, 720 ILCS 5/9-3(a); 730 ILCS 5/5-4.5-40(a) (maximum penalty of 5 years in prison), respectively.

## CONCLUSION

For the above reasons, the Court finds that the charged crime for which Ireland has requested Carr's extradition is an extraditable offense under the treaty. Accordingly, the Court orders the parties to brief, pursuant to the previously set schedule, the evidentiary and discovery issues for the probable-cause portion of these extradition proceedings. [See dkt. 17.]

E N T E R:

_____
BETH W. JANTZ
United States Magistrate Judge

Dated: November 3, 2020